389 A.2d 1041

**COMMONWEALTH of Pennsylvania**

v.

**Donald Lee CHISM, Appellant.**

Supreme Court of Pennsylvania.

Argued Sept. 30, 1977.

Decided July 14, 1978.

Harold J. Bender, Asst. Public Defender, Erie, for appellant.

Michael M. Palmisano, Asst. Dist. Atty., Erie, for appellee.

Before EAGEN, C. J., and O'BRIEN, ROBERTS, POMEROY, NIX, MANDERINO and PACKEL, JJ.

## OPINION

O'BRIEN, Justice.

Appellant, Donald Lee Chism, was convicted by a jury of five counts of murder of the first degree. Post-verdict motions were denied and appellant was sentenced to five consecutive terms of life imprisonment. This direct appeal followed.

Appellant does not challenge the sufficiency of the evidence. However, because this case involves convictions for murder of the first degree, this court has an independent duty to review the evidence. Act of February 15, 1870, P.L. 15, § 2, 19 P.S. § 1187. The evidence produced at trial is as follows.

On January 27, 1975, at approximately 9:25 or 9:30 a. m., appellant "discovered" the bodies of his wife, three children and the children's grandfather at the family home at 1050–52 West 26th Street, Erie. At the time of the crime, appellant was separated from his wife and was living at 627 West 32nd Street, Erie. When he discovered the bodies, appellant notified a neighbor, Edwin Rosenzweig. After going to the scene of the killing and observing the bodies, Rosenzweig called the police.

The police arrived at the Chism family residence at 10 a. m. and found that Paul Chism, appellant's twelve year old son, had been shot four times. Paul was covered with a

blood-soaked parka (appellant claimed he covered the body upon discovery). David Chism, age 9, had been shot five times, once from very close range. Appellant's six-year-old daughter, Annamaria, had been shot four times, once from close range. Paul Tolis, age 75 and the children's grandfather, had been shot four times. All four of these individuals were dressed in night clothes. The blood surrounding these bodies was dry and the bodies were cold to the touch. Rigor mortis was beginning to set in.

Police also found the body of appellant's wife, Athena, who had been shot three times at close range. Athena Chism worked the midnight shift in an allnight diner and was dressed in her working clothes. Her body was still warm and subsequent examination revealed that she had died two to three hours after the other four victims.

Police found several spent .22 caliber cartridges on the floor by the bodies. No murder weapon, however, was discovered at the time police first arrived.

Appellant accompanied police to headquarters. Although at the time appellant was not a suspect, he was given his *Miranda* rights. A trace metal test was administered to appellant and fingernail scrapings were taken.[1] Appellant then conferred with Eric County District Attorney Robert Chase and Erie Police Detective Sergeant Donald Levis for the purpose of helping authorities investigate the crime.

Appellant told police that he left his house at 32nd Street on the morning of the murder at 8:30 a. m. After stopping at a Texaco gasoline station at 32nd and Cherry, appellant went to a car wash at 38th and Liberty. He claimed he then went to a store before going to the 26th Street house and discovering the bodies. He told police he entered the house through the side door, which was always open because there was no key to the door. Appellant also told police that robbery or burglary could have been a possible motive for

1. The trace metal test revealed that appellant had recently handled metal, with an expert testifying that the markings on appellant's hand looked like the guard on a rifle. The results of the fingernail scrapings showed human blood on appellant's nails.

the slayings. He claimed that although he and his wife had been separated, they had sold the 26th Street house and were planning to move to Florida. Appellant further stated that, at the closing for the sale of their home, the couple received a check for over $16,000. According to appellant, his wife had cashed this check and had the $16,000 somewhere in the house, although he didn't know where. He also claimed that his wife had been carrying over $8,000 in her purse.

At trial, officers testified that the house, on first inspection, looked like it had been ransacked by burglars. However, the officers doubted that burglary was the motive, as too many valuable items were left behind, including an extensive coin collection of Mr. Tolis'. Further, an officer testified that while drawers were thrown on the floor of the house, the items inside the drawers were left undisturbed, further negating a possible burglary.

At the time of his conference with the investigating authorities, appellant was told that the spent cartridges were from a .22 caliber weapon. He admitted that he had bought a .22 caliber rifle for his oldest son, Paul, but he claimed not to know where it was.

Police informed appellant that they were going to search both the house on 26th Street and his apartment. When he asked why a search of his apartment was necessary, appellant was informed that police were checking for traces of blood on his clothing and in other places.[2] Appellant then told police that some of his clothing would certainly contain traces of blood from having covered his son Paul's body with the coat. Appellant then consented to the search.

While searching the attic of the house on 26th Street, police found a .22 caliber rifle hidden behind a removable piece of wallboard. The rifle was the one purchased by appellant. Subsequent tests showed that this rifle was indeed the murder weapon. At trial, witnesses also testified

2. Appellant and the three children had type O blood while Athena Chism and Tolis had type B blood.

that appellant was familiar with hiding places in the attic, as they had seen him hide various items in the attic.

Traces of blood were discovered in numerous places in appellant's apartment and automobile and on various items of clothing. Traces of both type O and type B blood were found almost everywhere in the bathroom. The blood deposited in appellant's apartment and automobile could not have been placed there merely by discovering his son's body, because when police arrived at the crime scene shortly after appellant allegedly discovered the bodies, the blood was already dry. Moreover, a witness who spent four to five days a week at appellant's apartment testified that he had never seen nor heard of anyone bleeding profusely in the bathroom at appellant's apartment.

Police were able to find numerous witnesses who contradicted parts of appellant's narrative. While appellant told police that he didn't leave his apartment until 8:30 on the morning of the killings, two neighbors testified that appellant's car was not in its normal parking place between 7:00 a. m. and 7:45 a. m. Another witness testified that he noticed appellant's car at his wife's house at 8:25 a. m.

Various witnesses testified that they had heard appellant threaten to kill his wife. In fact, appellant's mother was visiting five months before the murder when appellant told her "The next time you see me I'll be behind bars and she [Athena Chism] will be dead."

It was also established at trial that appellant, and not his wife, had cashed the check from the sale of the house. A handwriting expert testified that, in his opinion, appellant had forged his wife's signature on the back of the check.

It was also shown at trial that the buyer of the 26th Street residence discovered a key behind a grate which used to house a gas heater. When tested, the key opened the side door which appellant claimed was always open because of the lack of a key. Further, traces of both type O and type B blood were found on the grate and the key.

In *Commonwealth v. Long*, 470 Pa. 204, 206, 368 A.2d 265, 266 (1977), we stated:

"It is true that circumstantial evidence, in itself, may be sufficient to establish the commission of a crime and the accused's connection therewith. . . . It is equally true that in evaluating the sufficiency of the evidence after a guilty verdict, all of the evidence, be it direct or circumstantial, must be read in a light most favorable to the Commonwealth, and the Commonwealth must be given the benefit of all reasonable inferences arising therefrom. . . . But before a conviction will be sustained, 'the facts and circumstances proved must be of such a character as to establish guilt beyond a reasonable doubt.' . . . And, where a conviction is based entirely on circumstantial evidence, 'the theme of guilt must flow from the facts and circumstances proved, and be consistent with them all.' " (Citations omitted.)

We believe the evidence was sufficient to sustain appellant's convictions of murder of the first degree.

Appellant next argues that the suppression court erred in refusing to suppress various items of evidence which were introduced at trial. When police searched the house at 1050–52 West 26th Street, they did so without a warrant. Because of this, appellant believes the following should have been suppressed: the murder weapon found in the attic; the box the weapon was purchased in which was found in the cellar; other information concerning the purchase of the rifle; and the testimony of Robert McWhirter, who testified that he had seen appellant hide items in the attic. We believe, however, that all of these pieces of evidence and the testimony of Robert McWhirter were properly admitted.

The facts pertinent to this issue are as follows. Following the discovery of the bodies, appellant accompanied police to headquarters to help them investigate the crime. He told police about the sale of the house,[3] and told police that his wife had hidden a large amount of money somewhere in the house. He also informed police that Athena Chism had been

3. While appellant and his wife had sold the house about a week before the killings, the buyers agreed to allow the Chisms to remain in the house until the end of January.

carrying $8,000 in her purse. When police asked for permission to search the house for both the money and the purse, appellant gave police permission. In his brief, appellant admits to consenting to the search, but claims that his consent was limited to the first floor where all the bodies were found.

The suppression court denied appellant's motion to suppress on three alternative grounds: (1) appellant consented to the search of the house; (2) appellant lacked standing to contest the search; and (3) appellant abandoned the property in question. As we agree that appellant consented to the search of the house, we need not discuss the suppression court's alternative conclusions.

In *Commonwealth v. Johnson*, 467 Pa. 146, 151, 354 A.2d 886, 889 (1976), we stated our standard and scope concerning review of suppression court orders:

" . . . In reviewing this ruling our initial task is to determine whether the factual findings are supported by the record. 'In making this determination, we are to consider only the evidence of the prosecution's witnesses and so much evidence of the defense as, fairly read in the context of the record as a whole, remains uncontradicted.' *Commonwealth v. Goodwin*, 460 Pa. 516, 522, 333 A.2d 892, 895 (1975). If, when so viewed, the evidence supports the factual findings we are bound by such findings; we may only reverse if the legal conclusions drawn therefrom are in error." (footnote omitted.)

We further stated in *Commonwealth v. Harris*, 429 Pa. 215, 221, 239 A.2d 290, 293 (1968), "Consent must at least be freely given to be effective. This means there must be a total absence of duress or coercion, express or implied."

Viewed in the above light, the instant suppression record contains no evidence of either coercion or duress. Appellant was not under arrest at the time consent was given. As previously pointed out, appellant admits his consent was valid, but argues that he consented only to a search of the first floor of the residence. Again, the record contains no indication of such a limitation, and we therefore

hold that appellant consented to the search of the entire West 26th Street residence. As such, both the murder weapon found in the attic and the box in which the rifle was purchased, discovered in the basement, were properly admitted into evidence.

Appellant also argues that information concerning the purchase of the rifle and testimony of Robert McWhirter concerning appellant's knowledge of hiding places in the attic should have been suppressed as "fruits of the poisonous" search of the house and seizure of the murder weapon. Having determined that the search was legal, the other questioned evidence cannot be fruits of an illegal search.[4]

Detective Sergeant Toby Rigazzi, who participated in the search of the Chism home, found certain valuable items, including a silver dollar money clip, forty-seven silver dollars, an undetermined amount of change and currency, passbooks from two banks, and a checkbook. Rigazzi described these items at the trial. Appellant argues that Rigazzi should not have been permitted to do so because they were obtained as a result of an illegal search. We have already rejected that claim. Appellant also argues that the testimony was irrelevant. We reject that argument as well. Evidence is relevant if it tends to increase or decrease the probability of a material fact. *Commonwealth v. Myers*, 439 Pa. 381, 266 A.2d 756 (1970). Appellant advanced the theory that the killings were the result of a burglary. If there had been a burglary, the items might have been taken. Their presence on the premises supported the Commonwealth's contention that there had been no burglary. The testimony was, therefore, relevant and admissible.

District Attorney Chase testified for the Commonwealth concerning what appellant told him in the course of his investigation. Appellant conferred with Chase and Sergeant Levis and, according to Chase, appellant said he put a parka over the body of his son, Paul. This fact was not

4. Appellant challenges the admissibility of this evidence only as "fruits of a poisonous" tree and advances no other argument about its admissibility.

noted in a written report of the conversation made by Levis. Chase explained the omission by stating that in his judgment Levis could not have written down everything that was discussed at that time. Appellant objected on the basis that it is improper for a district attorney to express a personal opinion on a matter within the province of the jury. He claims to have been prejudiced because the evidence was the basis of a question asked later of an expert witness. Appellant relies on *Commonwealth v. Russell*, 456 Pa. 559, 332 A.2d 127 (1974), where this court found that it was improper for a former assistant district attorney, appearing as a witness, to testify that he was convinced of the defendant's guilt. We found it improper because he was not testifying from personal knowledge. In the instant case, Chase was testifying from personal knowledge and was not expressing an opinion on appellant's guilt or innocence. *Russell* is not applicable. We find that Chase testified properly from what he knew.

■ Appellant also objected to testimony given by Commonwealth witness Martha Clinger, his stepsister. Clinger testified that appellant told her on a number of occasions during July and August of 1974 (approximately six to seven months prior to the homicides) that he was having marital problems and that he said on a number of occasions that he would kill his wife and children. Appellant argues that the threats were too remote in time from the actual killings for evidence of them to be admissible. This objection is meritless. The testimony indicated ill will on the part of appellant, evidence of which is admissible in any homicide case. *Commonwealth v. Kravitz*, 400 Pa. 198, 161 A.2d 861 (1960). If the victim of a crime is the spouse of the accused, evidence of lack of affection between them is admissible to show motive. *Commonwealth v. Littlejohn*, 433 Pa. 336, 250 A.2d 811 (1969). In *Commonwealth v. Petrakovich*, 459 Pa. 511, 329 A.2d 844 (1974), where the defendant was accused of murdering his wife, we upheld the admission of evidence of instances of hostility and strains in their relationship, even though they occurred at least six months before the

killing. We held that the remoteness in time could affect the weight of the evidence but not its admissibility. We believe *Petrakovich* controls this case.

■ Clinger also testified about a conversation she had with appellant while he was in jail. She said that he told her that he did not miss his family, that when shown a photograph of a grave-marker he threw it onto a table, and that he showed no interest in hearing about the funeral. Appellant objected on the basis that the testimony was irrelevant and prejudicial. This evidence shows ill will and, therefore, we find that it was admissible.

■ Another item of evidence that appellant objected to was the testimony of Roger Gregorich, a state police documents examiner. Gregorich testified that appellant forged his wife's signature on the closing check from the sale of their house. Appellant claims that it was improper to admit evidence that appellant committed a crime other than those he was being tried for. Such evidence is not inadmissible in all cases. It may be admitted to show a common plan where proof of one crime tends to prove the other. *Commonwealth v. Boykin*, 450 Pa. 25, 298 A.2d 258 (1972). It is admissible to show motive or intent. *Commonwealth v. Terrell*, 234 Pa.Super. 325, 339 A.2d 112 (1975). In this case, the evidence of forgery tends to show ill will between appellant and his wife. It also indicates motive, i. e. to conceal the forgery. The evidence of forgery is relevant and admissible.

■ Samuel Potter, a correctional officer at a prison where appellant was incarcerated, testified that he was with the appellant on July 19, 1975 and appellant said, "My God, oh my God, oh my God, I didn't mean to kill them, my God." Appellant objected on the basis of the fact that the alleged statement was made six months after the killings and, therefore, it was irrelevant. The admission of the statement was proper. It tended to make it more probable that appellant committed the killings. See *Myers, supra*.

■ Appellant next claims that it was improper to allow a hypothetical question directed by the Commonwealth to

Herbert MacDonnell, a forensic scientist called as an expert. MacDonnell made an examination of the scene of the killings, in the course of which he examined the parka that covered the body of Paul Chism. He observed that the parka was extensively stained with blood. The Commonwealth sought to discredit appellant's story that he covered the body with the parka at the time he said he discovered it. The Commonwealth referred to testimony by three witnesses. Edwin Rosenzweig said that when he went to the scene with appellant, he saw dried blood on the parka and was able to recognize it as blood because he had handled dead bodies while in the Army during World War II. A police officer testified that he found the body cold to the touch at 9:50 a. m. A deputy coroner who arrived at the scene at 9:56 a. m. testified that he found signs of rigor mortis. MacDonnell testified that if the testimony that the Commonwealth referred to were accepted, Paul Chism would have had to have been dead for at least one to two hours before the witnesses observed the body. He said that the parka could not have been stained as it was if it were placed on the body as much as a half hour after death, meaning that it must have been put there before appellant claimed to have done so. Appellant argues that MacDonnell's opinion was based on facts not established by the record. If that were so, it would have been improper to admit the testimony. *Collins v. Hand*, 431 Pa. 378, 246 A.2d 398 (1968). Appellant alleges that the evidence does not support the factual basis for the hypothetical question. We do not agree. The witnesses were testifying from their personal observations, which they were competent to make. An adequate foundation for the hypothetical question was laid. If there was any question about it, the proper course for appellant was to challenge the opinion by cross-examination. *McSparran v. Hanigan*, 225 F.Supp. 628 (E.D.Pa.1963).

Appellant objected on the basis of relevance to testimony showing that he was frequently visited by a number of teenage boys and that he purchased certificates of deposit at a bank for two of them, one for $1,000 and one

for $500. (This was testified to by the bank clerk who handled the transactions.) Evidence showed that appellant's relationship with the boys was a source of friction between him and his wife and contributed to their separation. It had a bearing on appellant's marital relationship. We have already determined that evidence on such discordant relationships is relevant to show motive. Therefore, we find that the evidence was relevant and appellant's objection is meritless.

The trial court sustained a Commonwealth objection to certain proposed testimony of Angeline Catalino, a defense witness. Catalino was a co-worker of Athena Chism and was driven home by her on the morning of the killings. Appellant proposed to have Catalino testify that during the trip home, Athena Chism told her that the family, including appellant, was going to move to Florida. The testimony was disallowed as hearsay. Appellant argues that it was offered to show that the statement was made and not to show its truth. We find that the testimony was properly excluded. Appellant was attempting to establish that they were in fact going to move to Florida, thereby indicating reconciliation and lack of disaffection or motive to kill. Under these circumstances, we find that the statement was offered to show its truth.

Appellant takes exception to the trial court's refusal to give the following requested charge:

"You are instructed that you must not allow yourselves to be inflamed or prejudiced against the defendant by reason of the fact that there are five victims, three of which are children, to the crime charged since this fact is of no probative value whatever in regard to the particular defendant's guilt or innocence."

We find no error because of the following charge that the court did give:

"You must place yourself in this court of justice as officers of the court, charged with the duty of administering justice, disspelling from your hearts and minds any pas-

sion, any fear, any sympathy, any thought of favor or any other emotion that would be unworthy of you as members of this jury."

This charge substantially covered the same point. Since the same area was covered, there was no error in refusing the requested charge. *Commonwealth v. Newsome,* 462 Pa. 106, 337 A.2d 904 (1975).

Appellant next argues numerous instances of alleged ineffective assistance of counsel. We shall discuss these claims ad seriatum.

In *Com. ex rel. Washington v. Maroney,* 427 Pa. 599, 604–05, 235 A.2d 349, 352 (1967), we stated:

" . . . counsel's assistance is deemed constitutionally effective once we are able to conclude that the particular course chosen by counsel had *some reasonable basis* [emphasis in original] *designed to effectuate his client's interests.* The test is *not* [emphasis in original] whether other alternatives were more reasonable, employing a hindsight evaluation of the record. Although weigh the alternatives we must, the balance tips in favor of a finding of effective assistance as soon as it is determined that trial counsel's decision had any reasonable basis." (Emphasis supplied.)

The above standard is supplemented by *Commonwealth v. Rice,* 456 Pa. 90, 318 A.2d 705 (1974). In *Rice,* we stated that counsel would not be deemed ineffective in not pursuing meritless claims. Moreover in *Commonwealth v. Hubbard,* 472 Pa. 259, 372 A.2d 687 (1977), we refined our standard in judging the ineffective counsel claims in failure to object situations. In *Hubbard,* we articulated that when confronted with claims of failure to object or pursue avenues of questioning, we would look to merits of those *only* for the purpose of determining the effectiveness of counsel. Employing these standards, we will discuss appellant's allegations of ineffective assistance of counsel.

The first allegation of alleged ineffectiveness occurred when appellant was arrested. Appellant was first represented by George M. Schroeck, an attorney with the public defender's office, and then by D. Sherwood Jones,

who had previously represented him at the closing on his house. He argues that these attorneys were not properly authorized to represent him and refers to them as "officious intermeddlers." However, there is no indication that he did not want them or that he rejected them at the time. We find no basis for concluding that their mere presence was objectionable. Appellant alleges one specific act on their part, i. e. that they permitted him to answer some questions asked by the police, although later advising him to remain silent. The basis of his incompetent counsel claim is that the mere fact that appellant was a suspect made it impossible for there to be any reasonable basis for allowing him to answer questions. He presents nothing to support that contention, nor do we find any merit to it. Appellant does not allege that he was prejudiced by having answered questions. Without such a showing, we will not find his attorneys ineffective.

Appellant next argues incompetency on the part of his trial counsel. He alleges several errors. One is the failure to contest the legality of appellant's arrest and to challenge his subsequent statement to the police on the basis that it resulted from such allegedly unlawful arrest. We find no incompetency because a challenge would have been meritless. The circumstantial evidence on which the conviction was based was available to the police at the time of the arrest and was sufficient to give them probable cause. Appellant would have had no right to have the arrest declared illegal and the statement declared inadmissible. *Commonwealth v. Rice, supra.*

There were certain searches conducted which defense counsel did not seek to suppress. We reject appellant's allegation of incompetency. The first search complained of was conducted at the scene of the killings on the day the bodies were discovered. The search was made without a warrant. Appellant consented to having the police search the scene upon their arrival. The other searches were conducted pursuant to warrants at appellant's apartment and at a garage where his car was kept. We believe that

probable cause existed for issuance of the warrants and, therefore, counsel was not ineffective in failing to file a suppression motion concerning the searches. The object of the warrants was to search appellant's apartment and motor vehicle. The police affidavits in support of the warrants stated: that the police possessed evidence that a homicide had taken place; that appellant's story of non-involvement was being undercut by numerous items of evidence and testimony by police and witnesses concerning appellant's time table; and the existence of a gun of the type used in the homicide. Moreover, one of the supporting affidavits indicated that an uncontested search of appellant's apartment revealed blood stains. Detective Levis was accompanied by appellant and his attorney when Levis discovered what he believed to be blood stains in the bathroom. Levis then stated that he needed a warrant to retrieve samples of those stains.

The police were looking for clothing and blood stains. There was already evidence that the victims were killed with a weapon of the type owned by appellant, that the victims were not killed at the same time and that a burglary was unlikely. There was blood at the scene. Appellant was implicated. The evidence sought was relevant.

Appellant alleges ineffectiveness in that counsel failed to object to testimony by one of the teenage boys with whom appellant associated that appellant gave him a certificate of deposit. We have already determined that it was proper to admit evidence of the gift. Therefore, the failure to object is not ineffective assistance of counsel. See *Rice, supra.*

Another alleged error pertains to Samuel Potter's testimony that appellant admitted killing the victims. On cross-examination, defense counsel asked:

"Mr. Potter, is it possible that Mr. Chism made some statement like, 'Oh my God, it's terrible that they died' or something like that, is that possible?"

Potter answered, "Very possible, yes, sir." Appellant alleges that counsel should have moved to have Potter's testimony stricken. Such a motion would have had no merit. The quoted question and answer bore on the credibility of Potter's testimony, but did not render it inadmissible and we find no ineffectiveness of counsel.

During the trial, while the jurors were in the hotel where they were being sequestered, an unidentified person yelled "Hang him." The court instructed the jury to disregard the remark. Appellant alleges that counsel should have moved for a mistrial. We do not agree. It appears that any effect on the jury was minimal. Viewing the trial as a whole, we find that the remark had no significant effect. A mistrial motion would have been groundless. See *Commonwealth v. Levenson,* 225 Pa.Super. 318, 303 A.2d 838 (1973).

While appellant was incarcerated during the trial, a fire in the juvenile section of the prison killed several inmates. Appellant saw their bodies and became hysterical. The court recessed the trial for a half day and then resumed it after being advised by a physician that appellant was able to continue. We reject appellant's argument that counsel was ineffective in failing to object to the resumption of the trial. The court has discretion on the granting of continuances during trial. See *Commonwealth v. Smith,* 442 Pa. 265, 275 A.2d 98 (1971). We find no abuse of discretion, and, therefore, no ineffective assistance of counsel.

Appellant next argues that counsel should have objected to testimony given by appellant's landlord, James Cousins. Cousins testified that at the beginning of the lease, appellant paid six months' rent in advance. Appellant argues that the testimony was irrelevant. The testimony tended to make it less probable that appellant intended to move to Florida. The testimony having met the test for relevance, we find no ineffective assistance of counsel.

Another witness whose testimony appellant alleges should have been objected to was deputy coroner Richard Wagner, who examined the victims' bodies at the scene of

the killings. He testified as to their location and said that they showed signs of rigor mortis. Appellant argues that Wagner was not an expert, having had no medical training, and, was, therefore, not qualified to testify as he did. Wagner had been a police officer for twenty-two years and a deputy coroner for three years. He had attended seminars and received on-the-job training. On that basis, we find that he was qualified as an expert. Anyone with a reasonable pretention to specialized knowledge may testify, and the weight to be given to the testimony is a jury question. *Griffith v. Clearfield Truck Rentals, Inc.,* 427 Pa. 30, 233 A.2d 896 (1967). Expertise may be acquired by practical experience. *Abbott v. Steel City Piping Co.,* 437 Pa. 412, 263 A.2d 881 (1970). We find no ineffective assistance of counsel.

Finally, appellant argues that counsel should have objected to the court's failure to inform the jury of the penalty for voluntary manslaughter. The court defined voluntary manslaughter and told the jury it could convict appellant of involuntary manslaughter. See *Commonwealth v. Jones,* 457 Pa. 563, 319 A.2d 142 (1974). The jury was advised of the penalties for each degree of murder as required by the Crimes Code, Act of December 6, 1972, P.L. 1482, No. 334, § 1311, as amended, 18 Pa.C.S.A. § 1311(b). There has been no case decided or statute enacted requiring a charge on the penalty for voluntary manslaughter. In the absence of any such case or statute, we find no ineffectiveness in not having asked for such a charge.

Having rejected all of appellant's arguments, we will not disturb the judgments of sentence.

The judgments of sentence are affirmed.

EAGEN, C. J., and ROBERTS and NIX, JJ., concur in the result.

MANDERINO, J., files a dissenting opinion.

PACKEL, J., took no part in the decision of this case.

256

MANDERINO, Justice, dissenting.

I dissent. When the trial court failed to charge the jury on the penalty for voluntary manslaughter after defining the penalties for first, second, and third degree murder, the jury could reasonably infer that the trial judge did not believe that a verdict of voluntary manslaughter would be appropriate. It is true that the statute only requires a judge to instruct that jury as to the penalties for first, second, and third degree murder. But here the jury was unaware of the fact that the only reason they were not given the penalty for voluntary manslaughter was that it was not required by statute. Therefore, the jury was free to infer that it would not even be appropriate to consider voluntary manslaughter as a reasonable finding of guilt. Trial counsel should have requested an additional charge and by failing to do so was ineffective.