511 A.2d 764

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Alfred K. ALBRECHT, Sr., Appellant.**

Supreme Court of Pennsylvania.

Argued Oct. 21, 1985.

Decided June 23, 1986.

Reargument Denied Oct. 21, 1986.

Stuart Wilder, Asst. Public Defender, for appellant.

Michael J. Kane, Dist. Atty., Robert Goldman, Deputy Dist. Atty., Stephen B. Harris, Doylestown, for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDER-MOTT, HUTCHINSON, ZAPPALA and PAPADAKOS, JJ.

## OPINION OF THE COURT

PAPADAKOS, Justice.

This direct appeal arises from the conviction and death sentence of Alfred K. Albrecht, Sr. (Appellant) pursuant to 42 Pa.C.S. § 9711(h).[1] Appellant was found guilty by a jury on charges of murder of the first degree for the killing of his wife,[2] murder of the second degree for the killing of both his daughter and mother,[3] and arson[4]. Prior to Appellant's trial, a Motion to Suppress[5] was filed, argued and subsequently denied by the trial judge, Honorable William Rufe, III. Following a hearing at the penalty stage, post-verdict motions were argued, requesting a new trial and arrest of judgment. These motions were denied by the court en banc (Beckert, Rufe, Bortner, JJ.) and this automatic appeal followed.

1. 42 Pa.C.S. § 9711(h) provides:
    (h) *Review of death sentence.—*
    (1) A sentence of death shall be subject to automatic review by the Supreme Court of Pennsylvania pursuant to its rules.
    (2) In addition to its authority to correct errors at trial, the Supreme Court shall either affirm the sentence of death or vacate the sentence of death and remand for the imposition of a life imprisonment sentence.
    (3) The Supreme Court shall affirm the sentence of death unless it determines that:
        (i) the sentence of death was the product of passion, prejudice or any other arbitrary factor;
        (ii) the evidence fails to support the finding of an aggravating circumstance specified in subsection (d); or
        (iii) the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant.

2. 18 Pa.C.S. § 2502(a).

3. 18 Pa.C.S. § 2502(b).

4. 18 Pa.C.S. § 3301(a).

5. The motion centered around the admissibility of a gasoline can found in Appellant's car located on the premises where the fire originated.

For the reasons now stated, we affirm Appellant's convictions and sentence of death.

The evidence presented at the guilt stage of the trial established that on May 1, 1979, Appellant's neighbor, who coincidentally was an Assistant Chief for the Perkasie Fire Company, saw smoke emanating from Appellant's home. After calling the fire department, Appellant's neighbor proceeded across the street, where he encountered Appellant dressed solely in his undergarments. While Appellant and this neighbor were talking, one of the firemen responding to the fire alarm arrived and entered the flaming structure where he discovered the charred remains of Caroline Albrecht, Appellant's wife, age 34; Anita Albrecht, Appellant's daughter, age 9; and Marian Albrecht, Appellant's mother, age 72. Medical testimony adduced at trial established the cause of death for all three was from the conflagration.

The Commonwealth's case against Appellant was based upon showing numerous instances of disharmony and acts of violence between the Appellant and his deceased wife. This theory was developed through the presentation of Commonwealth witnesses who testified to the constant arguing between Appellant and his wife and to the oft-observed battered appearance of Appellant's wife. Specifically, Patricia Fullmer, a friend of Caroline Albrecht's for approximately four years, testified that Appellant constantly criticized and ridiculed his wife, and that Appellant admitted he had a girlfriend. Mrs. Fullmer also testified that Caroline had a good relationship with the other members of the family.

In January, 1979, George Weaver, a neighbor of Appellant, overheard Appellant in the Whitehorse Bar referring to his wife as a "dumb bitch, I'm going to get her." Approximately seven months after the fire, Mr. Weaver again saw Appellant at the Whitehorse Bar. Mr. Weaver testified to overhearing Appellant say, he was "glad it's over" and that he was "glad they're gone and that the house was burned." Mr. Weaver also stated that the

couple was always arguing and, on one occasion, he observed them pushing each other. Larry Wimmer, a friend of Appellant for twelve to fifteen years, testified that Appellant and he were in Herb and Joyce's Park Tavern during the middle of April, 1979, when Appellant complained of domestic problems. He said that he was being forced to move out of his house because he hit his wife, and that he would kill her if he couldn't get back in his house.

Attorney Marc Steinberg had represented Caroline Albrecht and filed a Protection from Abuse Petition in the Court of Common Pleas of Bucks County in his guest to prevent Appellant from abusing his client. The Bucks County Court entered an order directing Appellant to refrain from abusing his wife for one year. Subsequently, on February 6, 1979, Attorney Steinberg saw his client, who complained that her husband was still beating her. He further testified that Mrs. Albrecht had black and blue marks on both her arms, a black eye, and holes in her head where hair had been pulled out.

Carol and Terry Kuhns were neighbors of Appellant. In January, 1979, Caroline Albrecht went to her neighbors, asking that they hide her in their basement because she was nervous and afraid. She stated she was not wearing her dentures because she was afraid Appellant would hit her so hard she would swallow them. The Kuhns noticed black and blue marks on her face, neck, and legs, burn marks on her face, and hair pulled out of her head. Later that evening, Appellant stormed into the Kuhns' residence and demanded to be told the whereabouts of his wife, to which the Kuhns responded, at Caroline's request, that she was not present. On February 1, 1979, Caroline Albrecht again went to the Kuhns' residence. They noticed that she was still very bruised.

Commonwealth witnesses Sara Joraskie and Bonita Waitl also testified as to the battered appearance of Appellant's wife.

The Commonwealth also elicited testimony from Valerie Cullingford, a bartender at Herb and Joyce's Tavern. She

testified that in December, 1978, she observed Appellant kissing and holding hands with a woman named Linda, whom the witness had seen before on several occasions. Ms. Cullingford overheard Appellant ask the woman to leave with him so that he could "make a little love to her." This witness further testified that the night before the fire, Appellant came into the bar and drank five or six beers at a rate that seemed faster than usual. Appellant proceeded to discuss how he was having problems with his wife, and said that if she tried to remove him from the house again "he would sooner burn the god damned thing down."

A few days prior to the fire, John Wheeler, an employee of Herb and Joyce's Tavern who had known Appellant for approximately one year, observed Caroline Albrecht with a bruise around her eye and heard Appellant state he would rather burn down his house than let his wife have it. Prior to this conversation, Appellant had told John Wheeler that if his wife gave him any trouble he would take care of her. In yet another conversation, Appellant stated that he needed a good lawyer.

Donald Weaver, one of Appellant's neighbors, testified that at the Whitehorse Bar, two or three days before the fire, he heard someone say he was going to go home and "shoot the old lady and burn the house down." He later learned that it was Appellant who made those statements. This witness also testified he heard noises and loud voices emanating from the Albrecht residence on the night of the fire.

Testimony from Paul Serockie, who was an acquaintance of Appellant for a few years, revealed that a few days before the fire, while at the Whitehorse Bar, he overheard Appellant say he was going to burn down his house. At a later date after the fire, Appellant told the witness that he had a good lawyer and that he "would get away with it and nobody could prove it."

On the evening prior to the fire, Police Officer Barry Heckenswiler was summoned to the Albrecht house in response to a call by Appellant's son. Upon his arrival,

Officer Heckenswiler smelled the odor of alcohol on Appellant's breath and noticed Marian Albrecht sweeping up glass from a broken lamp. Caroline Albrecht told the officer she had an argument with her husband, that Appellant threatened to burn her dress, and that she wanted to go to a hospital or local psychiatric institution. Subsequently, the situation calmed and Officer Heckenswiler left. The next morning the house was engulfed in flames and three of the Albrechts had died.

█ Our independent review of the record convinces us that sufficient evidence exists to support the verdicts of guilt against Appellant. Furthermore, the evidence proves beyond a reasonable doubt the willful, premeditated, deliberate and specific intent to commit murder on Appellant's part. This intent can be inferred from the numerous physical assaults on Appellant's wife and threats made to numerous individuals to kill Appellant's wife and burn their house down.

The first argument Appellant raises is that the suppression court committed reversible error in failing to suppress a gasoline can from the trunk of Appellant's vehicle. The record shows that soon after the firemen had the blaze under control, the Fire Marshall and state police roped off the property for investigation purposes. Included in the roped-off area was a driveway in which a car was parked approximately fifteen feet from the house with the keys in the ignition. This vehicle, along with another vehicle parked in the roped-off area, were later found to be registered in Appellant's name.

On May 2, 1979, the morning after the fire, Appellant signed a consent form allowing investigators to search his premises for the purpose of determining the cause of the fire. The trunk area of Appellant's car was searched, revealing the presence of an almost empty five-gallon gas can. The can was not taken and the keys were replaced in the ignition. Later that day, Appellant's fifteen year old son was questioned by the State Fire Marshall regarding

the whereabouts of any gas cans on the premises.[6] Appellant's son proceeded to show the Marshall a can located in the garage that was propping up a window and had obviously not been used in some time. The Marshall then asked Appellant's son if he knew of any other gas cans, to which the son replied, "There's a hydraulic oil can in the trunk of my father's car." At the Marshall's request, Appellant's son removed the keys from the ignition and opened the trunk where the can was located. Again, the can was not seized.

During the afternoon of May 2, 1979, the State Fire Marshall requested that Trooper Donorovich obtain a voluntary consent or a search warrant for the contents of the vehicle housing the gas can. Appellant, later that day, signed a voluntary consent, altered by his attorney,[7] after being advised of his *Miranda* rights. Based upon the written consent form, the Trooper took possession of the gas can.[8]

Appellant specifically claims the search of his vehicle and confiscation of the gas can was illegal because, (1) no search warrant was utilized, (2) Appellant's right to privacy was violated, and (3) no valid consent to search the vehicle existed.

The better practice under this factual situation would have been for the investigating officers to have secured a search warrant, which would not have been difficult in this case. However, by acquiring written consent to seize the gas can pursuant to the negotiations of Appellant's counsel, any evidentiary problems which may have arisen by the introduction into evidence of the gas can were cured.

6. The record shows the State Fire Marshall knew a gas can existed in Appellant's trunk at the time he was questioning Appellant's son.

7. In reality, considerable negotiation occurred between Appellant's counsel and the investigating State Police officers regarding the wording of the consent form.

8. At no time prior to the signing of the consent form was Appellant, or his counsel, informed that the can had been observed twice and that no search warrant existed.

The negotiated consent form, as signed by Appellant, stated in pertinent part:

I, Alfred K. Albrecht, having been informed of my constitutional right not to have a search made of the vehicle hereinafter mentioned without a search warrant and my right to refuse to consent to such a search, hereby authorize Trps. Edward Donorovich and William York Pennsylvania State Police Officers and their assistants to conduct a search of ... [the vehicle in question].

These officers are authorized by me to take from my vehicle of which I am the lawful owner, any physical objects, materials or substances which may be believed to have been used in initiating or accelerating a fire....

This written permission is being given by me on the advice of my Attorney.... This permission is being given by me to the above-mentioned officers voluntarily and without threats or promises of any kind.

Although a warrantless search occurred herein:

The Fourteenth Amendment does not preclude a warrantless search of property when consent is given by a person possessing the authority to consent to such search. *United States v. Matlock*, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *Bumper v. North Carolina*, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968); *Johnson v. United States*, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948); *Zap v. United States*, 328 U.S. 624, 66 S.Ct. 1277, 90 L.Ed. 1477 (1946); *Commonwealth v. Kontos*, 442 Pa. 343, 276 A.2d 830 (1971); *Commonwealth v. Platou*, 455 Pa. 258, 312 A.2d 29 (1973); *Commonwealth v. Storck*, 442 Pa. 197, 275 A.2d 362 (1971).

*Commonwealth v. Latshaw*, 481 Pa. 298, 303, 392 A.2d 1301, 1304 (1978).

In determining that the consent was proper, we note that the consent was knowingly, voluntarily, and intelligently given and that Appellant had his attorney present when he executed the consent form. The investigating officers

were under no obligation to inform Appellant that they were aware of the gas can in the trunk of the car, and, absent a showing of stealth, deceit or misrepresentation, the consent must stand. We find no error in the suppression court's order allowing the gas can to be received into evidence.

Appellant next argues error in two aspects of the jury selection process. First, he contends the trial court committed error when jurors were excluded for cause because they expressed a conscientious objection to the death penalty. Specifically, Appellant relies on the standard set forth in *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), and contends that the Commonwealth's questioning of prospective veniremen overstepped the bounds of *Witherspoon*. We disagree. The Court in *Witherspoon* set forth the rule of law that:

... a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction.

*Id.*, 391 U.S. at 522, 88 S.Ct. at 1777.

... They cannot be excluded for cause simply because they indicate that there are some kinds of cases in which they would refuse to recommend capital punishment. And a prospective juror cannot be expected to say in advance of trial whether he would in fact vote for the extreme penalty in the case before him. The most that can be demanded of a venireman in this regard is that he be willing to *consider* all of the penalties provided by state law, and that he not be irrevocably committed, before the trial has begun, to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings. If the voir dire testimony in a given case indicates that veniremen were excluded on any broader basis than this, the death sentence cannot be carried out even if applicable

statutory or case law in the relevant jurisdiction would appear to support only a narrower ground of exclusion. *Id.* at 522, n. 21, 88 S.Ct. at 1777, n. 21.

In the instant case, the trial judge performed admirably in his handling of the voir dire. Nine prospective jurors were eliminated for cause following questioning concerning their inability to impose the death penalty. The first of these veniremen, Mr. Barnes, stated he was morally against the death penalty and could not impose it even if the law required him to do so. The next venireman, Mrs. Miller, was excused because, although she said at first she could follow the judge's instructions, she later stated she could not impose the death penalty under any circumstances because "it's not my nature." Miss Galbraith was excused because she could not impose the death penalty and that, because of the possibility of imposing death, she could not render a verdict of guilty of murder of the first degree. Mrs. Bernstein stated she did not think she could impose the death penalty under any circumstances, while Mrs. Kuhn [9] stated she could not put her feelings aside to make a decision and impose the death penalty. Another venireman, Mrs. McMaster, stated it would be very hard to impose the death penalty and that she was afraid she would be trying to place a lot of importance on mitigating circumstances. Mr. Mendicino was excused because he did not think he could impose the death penalty. Mrs. Maclas emphatically stated she did not believe in the death penalty under any circumstances and could not impose it, while Mr. Vail said, based upon moral and conscientious reasons, no matter what the circumstances, he could not impose the penalty of death. Lastly, Mr. Lenhart was very vocal regarding the imposition of the death penalty, and said he would impose such a sentence only where a person, while in jail for first degree murder, committed a second murder.

It is clear from the language in *Witherspoon* that the aforementioned jurors were properly excused.

**9.** It was established during voir dire that this juror was not related to Mr. and Mrs. Kuhn who testified as Commonwealth witnesses.

°Nothing we say today bears upon the power of a State
to execute a defendant sentenced to death by a jury from
which the only veniremen who were in fact excluded for
cause were those who made unmistakably clear (1) that
they would *automatically* vote against the imposition of
capital punishment without regard to any evidence that
might be developed at the trial of the case before them,
or (2) that their attitude toward the death penalty would
prevent them from making an impartial decision as to the
defendant's guilt.

*Witherspoon v. Illinois,* 391 U.S. 510, 522–23 n. 21, 88 S.Ct.
1770, 1777 n. 21, 20 L.Ed.2d 776 (1968). The nine individu-
als who were excused for cause clearly could not have
imposed the death penalty and, as such, were properly
excused under the law of *Witherspoon.*

Secondly, Appellant raises a constitutional argument
claiming he was denied his right under the United States
and Pennsylvania Constitutions to a jury comprised of a fair
cross-section of the community and, therefore, a new trial
should be granted. During the jury selection process, it
was discovered that additional jurors would be required
and, pursuant to Pa.R.C.P. 1109,[10] the trial judge issued an
order for thirty additional jurors.[11] That order was imple-
mented by thirteen deputies from the Sheriff's office who
proceeded in six cars to various assigned areas in Bucks
County. Their instructions were to serve summons on
residents of Bucks County who did not have vacations
planned for the next two weeks. The deputies, after visit-

10. Rule 1109. *Exhaustion of the Jury Panel*
When a sufficient number of qualified jurors are not present to permit
selection of a jury, the court shall:
(a) Require the officials designated by law to summon prospective
jurors to summon and return immediately from the county at large as
many qualified and competent persons as shall be necessary; or
(b) Order in writing that the officials designated by law to summon
prospective jurors produce the jury wheel or master list in open court
in the presence of the judge, and to draw therefrom five names for
every juror required. A venire shall then be issued requiring that
those persons so drawn be brought into court at a time certain.

11. At the time this order was issued, eleven jurors had already been
selected to serve on this jury.

ing several shopping centers in the county, issued twenty-nine summons.

■ Appellant's argument that this selection process is improper and does not meet constitutional standards is meritless. The trial judge was well within his discretion to issue an order for additional jurors, and the process of selecting these individuals was proper. The constitutional threshold of providing a jury that reflects a fair cross-section of the community was met. *Commonwealth v. Martinez*, 475 Pa. 331, 380 A.2d 747 (1977), See, *Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975).

The Court in *Commonwealth v. McGrew*, 375 Pa. 518, 525, 100 A.2d 467, 470 (1953), stated: "The examination of jurors under voir dire is solely for the purpose of securing a competent, fair, impartial and unprejudiced jury." We also there observed that "the scope of a voir dire examination rests in the sound discretion of the trial Judge and his decisions, even in a challenge for cause, will not be reversed in the absence of palpable error." (Citations omitted.) Appellant herein has not shown with any specificity how the selection of additional jurors excluded any particular group from the selection process such that the jury was not comprised of a cross-section of the community.

In the case of *Duren v. Missouri*, 439 U.S. 357, 363, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979), the Court stated:

For appellant to make out a prima facie violation of the "fair-cross-section" requirement of the sixth and fourteenth amendments, he must show:

(1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury selection process.

618

See *Commonwealth v. Harris*, 492 Pa. 389, 392, 424 A.2d 1245, 1247 (1981). The record shows Appellant's counsel had ample opportunity to question all of the additional veniremen as well as to question the deputies' participation in the selection process.[12] This fact, coupled with Appellant's shallow contention that the additional jurors were not a fair cross-section of the community, causes this issue to fail. Additionally, Appellant is "not entitled to the services of any particular juror but only as to twelve unprejudiced jurors." *Commonwealth v. Fisher*, 447 Pa. 405, 410, 290 A.2d 262, 265 (1972).

Appellant also argues it was error for the trial court to admit evidence regarding Appellant's prior misconduct toward his wife. Specifically, Appellant claims the evidence of his action was inflammatory and of a highly prejudicial nature, and as such outweighed any probative value. The trial court allowed evidence regarding the six or seven months prior to the death of Appellant's wife, ruling that any evidence of misconduct antecedent to that time would be too remote for admissibility.

It is very clear that evidence regarding ill-will toward a victim in a homicide case is admissible, *Commonwealth v. Kravitz*, 400 Pa. 198, 161 A.2d 861 (1960), *cert. denied*, 365 U.S. 846, 81 S.Ct. 807, 5 L.Ed.2d 811 (1961); *Commonwealth v. Glover*, 446 Pa. 492, 286 A.2d 349 (1972); *Commonwealth v. Ulatoski*, 472 Pa. 53, 371 A.2d 186 (1977); *Commonwealth v. Nelson*, 396 Pa. 359, 152 A.2d 913 (1959); *Commonwealth v. Faison*, 437 Pa. 432, 264 A.2d 394 (1970). In *Commonwealth v. Petrakovich*, 459 Pa. 511, 329 A.2d 844 (1977), and *Commonwealth v. Ulatoski, supra,* we held that when the deceased victim's spouse is the defendant, evidence concerning the marital relationship will be admissible for the purpose of illustrating ill-will, motive, or malice. Evidence regarding hostility and strain in a marriage is also admissible. *Commonwealth v. Chism*, 480 Pa. 233, 389 A.2d 1041 (1978). See *Commonwealth v. Ulatoski, supra.*

**12.** In point of fact, Appellant's counsel questioned two deputies who between them had served nine summons.

■ In applying these principles to this case, we note the existence of numerous instances of violent and hateful conduct between Appellant and his wife. Had there been only an isolated incident, that evidence would have been inadmissible. *Commonwealth v. Baker*, 466 Pa. 382, 353 A.2d 406 (1976). We are not confronted, however, with an isolated incident. Rather, the Commonwealth produced a chain of evidence illustrating Appellant's continual abuse of his wife. Several witnesses testified to marital problems Appellant and his wife experienced on the very night of the killings. Photographs illustrating the wife's battered condition, including cigarette burns on her face, were admitted into evidence after witnesses testified to her continuous gruesome appearance. Appellant not only admitted to slapping his wife occasionally, but that he was under court order to forego the physical abuse of his wife. The trial court ruling admitting evidence of Appellant's actions towards his wife for a period of seven months prior to the house burning was proper as it went to showing his ill-will and malice towards her, establishing his homicidal motive, and culminated in his murdering her.

Appellant next argues that the trial court committed reversible error in failing to require sequestration of a Commonwealth expert arson witness. Prior to trial, a motion to sequester all witnesses was granted by the trial court. However, Mr. Sweet, a Commonwealth witness and arson expert, was permitted in the courtroom over Appellant's objection and testified on rebuttal following the completion of Appellant's case. Appellant argues that giving the expert the opportunity to hear all the evidence, and, as Appellant presumes, to base his opinion on that evidence, invaded the province of the jury from a credibility standpoint. We disagree.

■ The decision of whether or not to sequester a witness is within the province of the trial judge and, absent a clear abuse of discretion, will not be reversed. *Commonwealth v. Holland*, 480 Pa. 202, 389 A.2d 1026 (1978); *Commonwealth v. Yount*, 455 Pa. 303, 314 A.2d 242 (1979);

*Commonwealth v. Hamilton,* 459 Pa. 304, 329 A.2d 212 (1974); *Commonwealth v. Kravitz,* 400 Pa. 198, 161 A.2d 861 (1960), *cert. denied,* 365 U.S. 846, 81 S.Ct. 807, 5 L.Ed.2d 811 (1961). Appellant correctly cites the case of *Commonwealth v. Fant,* 480 Pa. 586, 391 A.2d 1040 (1978), *cert. denied,* 441 U.S. 951, 99 S.Ct. 2180, 60 L.Ed.2d 1056 (1979), for the proposition that a witness should be prevented from shaping his testimony from evidence presented by other witnesses. However, an expert witness may state his opinion based upon evidence he has heard presented in the courtroom. *Commonwealth v. Daniels,* 480 Pa. 340, 390 A.2d 172 (1978). The expert witness testified that he arrived at his conclusion regarding the fire from reports and pictures presented to him by the Pennsylvania State Police, Fire Marshall's Division and the testimony of various witnesses on direct and cross-examination. In addition, Appellant's counsel interrogated the arson expert witness extensively on cross-examination. Finally, the fact that the record supports a conclusion that the Commonwealth arson expert based his opinion on testimony from other witnesses assures us that his opinion was based upon facts present in the record and within the knowledge of the jury, *Commonwealth v. Paskings,* 447 Pa. 350, 290 A.2d 82 (1972), and renders Appellant's argument meritless.

■ Appellant fails to show specifically what damage occurred by this witness not being sequestered. He argues merely in boilerplate fashion that the jury's function was usurped. This contention, without more, must fail. As we indicated in *Daniels, supra,* the jury, in the final analysis, is free to accept or reject an expert's opinion.

■ Appellant next challenges the constitutionality of the Pennsylvania Death Penalty Statute. He contends 42 Pa. C.S. § 9711(d)(6), 9711(e), and 9711(c)(1)(iv) violate the United States Constitution, Eighth and Fourteenth amendments, in that they are overbroad and lead to an arbitrary and capricious imposition of the death penalty. 42 Pa.C.S. § 9711(d)(6) states:

(d) Aggravating circumstances.—Aggravating circumstances shall be limited to the following:

(6) The defendant committed a killing while in the perpetration of a felony.

In particular, Appellant claims the Legislature has not defined or limited the felonies for which a death penalty may be imposed and, therefore, this section of the statute is unconstitutional. In the instant case, the jury's verdict included one aggravating circumstance, namely 9711(d)(7), knowingly created a grave risk of death to another person in addition to the victim of the offense. As we stated in *Commonwealth v. Maxwell*, 505 Pa. 152, 168, 477 A.2d 1309, 1318 (1984), "this Court has consistently held that a claimant cannot challenge the constitutionality of a statute abstractly; he is afforded such right only if it is sought to be enforced in his particular case." Therefore, Appellant's argument regarding § 9711(d)(6) is inappropriate.

Secondly, Appellant argues that the wording in 42 Pa.C.S. § 9711 is patently unclear. This section states:

*Mitigating circumstances.—*

Mitigating circumstances shall include the following:

(1) The defendant has no significant history of prior criminal convictions.

(2) The defendant was under the influence of extreme mental or emotional disturbance.

(3) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.

(4) The age of the defendant at the time of the crime.

(5) The defendant acted under extreme duress, although not such duress as to constitute a defense to prosecution under 18 Pa.C.S. § 309 (relating to duress), or acted under the substantial domination of another person.

(6) The victim was a participant in the defendant's homicidal conduct or consented to the homicidal acts.

(7) The defendant's participation in the homicidal act was relatively minor.

(8) Any other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense.

Appellant, however, fails to give us an explanation of how this section in its entirety is patently unclear, except to single out subsections (1), (2), and (4). We have previously upheld these subsections in *Commonwealth v. Beasley*, 504 Pa. 485, 475 A.2d 730 (1984), which states:

Appellant further contends that certain language employed in the statute's enumeration of aggravating and mitigating circumstances, to be weighed by the jury in determining whether the death penalty should be imposed, are (sic) so vague as to invite arbitrary and capricious imposition of the death penalty. The challenged language includes, *inter alia*, the phrases "significant history of prior criminal convictions" (42 Pa.C.S.A. § 9711(e)(1), "extreme mental or emotional disturbance" (42 Pa.C.S.A. § 9711(e)(2), "age of defendant" (42 Pa.C. S.A. § 9711(e)(4). In reviewing an identical claim of vagueness asserted against the corresponding portion of the death penalty statute of the State of Florida, which employed virtually identical language, the Supreme Court of the United States rejected the vagueness claim, noting that a jury's evaluation of the aggravating and mitigating circumstances, as enumerated, requires no more line drawing than is commonly required of a factfinder in any lawsuit. *Proffitt v. Florida*, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976).

Appellant's claims of unconstitutionality have previously been ruled upon and rejected by this Court, and he has presented no reason for us to change our view.

Lastly, Appellant argues the unconstitutionality of 42 Pa.C.S. § 9711(c)(1)(iv) which states:

(c) Instructions to jury.—

(1) Before the jury retires to consider the sentencing verdict, the court shall instruct the jury on the following matters:

(iv) the verdict must be a sentence of death if the jury unanimously finds at least one aggravating circumstance specified in subsection (d) and no mitigating circumstance or if the jury unanimously finds one or more aggravating circumstances which outweigh any mitigating circumstances. The verdict must be a sentence of life imprisonment in all other cases.

Appellant, in reality, also argues the constitutionality of 42 Pa.C.S. § 9711(c)(1)(iii), which requires that a defendant must prove mitigation by a preponderance of the evidence. This section provides:

(c) *Instructions to jury.*—

(1) Before the jury retires to consider the sentencing verdict, the court shall instruct the jury on the following matters:

(iii) aggravating circumstances must be proved by the Commonwealth beyond a reasonable doubt; mitigating circumstances must be proved by the defendant by a preponderance of the evidence.

Specifically, Appellant contends that subsection (c)(1)(iv) mandates that a sentence of death be imposed and that, therefore, due process is violated. Suffice it to say, this issue has been satisfactorily dealt with in *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976), and *Commonwealth v. Zettlemoyer,* 500 Pa. 16, 454 A.2d 937 (1982) *cert. denied sub nom. Zettlemoyer v. Pennsylvania,* 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983), wherein that argument was rejected.

Appellant next argues that the sentence of death was against the weight of the evidence since the jury found a greater number of mitigating than aggravating circumstances. This argument is meritless. After hearing all the testimony in the guilt phase, the jury unanimously found Appellant guilty of murder of the first degree and guilty on two counts of murder of the second degree. Pursuant to 42 Pa.C.S. § 9711(a)(1),[13] a sentencing hearing was held where-

---

13. Section 9711(a)(1) provides as follows:

by the jury, after reviewing the ten aggravating circumstances and seven mitigating circumstances found one aggravating and three mitigating circumstances to exist. Specifically, the jury found 42 Pa.C.S. § 9711(d)(7) applicable as an aggravating circumstance; namely, the defendant created a grave risk of death to another person in addition to the victim of the offense. The jury also found the mitigating factors of 42 Pa.C.S. § 9711(e)(1), the defendant has no significant history of prior criminal convictions; § 9711(e)(2), the defendant was under the influence of extreme mental or emotional disturbance; and § 9711(e)(8), any other evidence of mitigation concerning the character [14] and record of the defendant and the circumstances of his arrest.

■■■ It is within the exclusive province of a jury to determine the guilt or innocence of a defendant and, after hearing evidence at the penalty stage, to make findings on the existence of aggravating and mitigating circumstances and after weighing the circumstances, to issue a sentence. The jury's conclusion that the one aggravating circumstance outweighed the three mitigating circumstances found was within its discretion. After our reviewing the record, we find that sufficient evidence exists to support the finding of one aggravating circumstance, find nothing to indicate that the sentence of death was a product of passion, prejudice or arbitrariness and, thus, see no reason to disturb the findings of the jury.

Lastly, Appellant raises several instances of alleged ineffective assistance of counsel. These include: 1) failure to introduce at trial that Appellant received threats against him; 2) failure to object to the lack of a point for charge limiting the jury's use of Appellant's prior misconduct; 3)

*Sentencing procedure for murder of the first degree*
(a) Procedure in jury trials.—
   (1) After a verdict of murder of the first degree is recorded and before the jury is discharged, the court shall conduct a separate sentencing hearing in which the jury shall determine whether the defendant shall be sentenced to death or life imprisonment.

**14.** The jury specifically found Appellant was a "good worker."

failure to call certain character witnesses; 4) failure to object to hearsay testimony; 5) failure to object to the incorporation of trial testimony into the penalty phase; and 6) failure to call additional character witnesses at the sentencing phase of Appellant's trial.[15]

In *Commonwealth ex rel. v. Maroney*, 427 Pa. 599, 235 A.2d 349 (1967), the standard for ineffective assistance of counsel was established. The court in *Maroney*, quoting *Commonwealth ex rel. Mullenaux v. Myers*, 421 Pa. 61, 217 A.2d 730 (1966), stated "the concept of 'effective representation' must be strictly construed and no deprivation found to result unless Appellant's representation was so lacking in competence as to make a mockery of justice." *Maroney*, 427 Pa. at p. 602, 235 A.2d at p. 351. The Court in *Maroney* also held:

> We cannot emphasize strongly enough, however, that our inquiry ceases and counsel's assistance is deemed constitutionally effective once we are able to conclude that the particular course chosen by counsel had some reasonable basis designed to effectuate his client's interest. The test is not whether other alternatives were more reasonable, employing a hindsight evaluation of the record. Although weigh the alternatives we must, the balance tips in favor of a finding of effective assistance as soon as it is determined that trial counsel's decisions had any reasonable basis. (Footnote omitted.)

*Maroney*, 427 Pa. at pp. 604–605, 235 A.2d at pp. 352–353.

We also noted in *Maroney* that:

> ... for relief to be granted, *Appellant* must demonstrate that counsel's ineffectiveness worked to his prejudice....

*Commonwealth ex rel. Washington v. Maroney, supra,* 427 Pa. at 605 n. 8, 235 A.2d at 353 n. 8. *See also, Commonwealth v. Bandy*, 494 Pa. 244, 431 A.2d 240 (1981).

15. Appellant, in the table of contents of his brief, raises an ineffective assistance of counsel claim regarding trial counsel's failure to object to the trial judge's charge which lacked an instruction that the jury could consider sympathy during the penalty stage. Appellant, however, fails to argue this point in the text of his brief. After conducting an independent review of this claim, we find no error.

626

The Supreme Court of the United States has established the same standard pursuant to federal constitutional strictures in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) *reh den.*, 467 U.S. 1267, 104 S.Ct. 3562, 82 L.Ed.2d 864.

An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment.... Accordingly, any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution. *Id.*, 466 U.S. at 691–92, 104 S.Ct. at 2067, 80 L.Ed.2d at 696.

Further, counsel will not be considered ineffective for failure to assert a meritless claim. *Commonwealth v. State*, 504 Pa. 455, 472, 475 A.2d 714, 723.

With the *Maroney* standard in mind we will address Appellant's itemized list of ineffectiveness.

■ Appellant's first claim of ineffectiveness rests upon the failure of trial counsel to introduce evidence that in the latter part of 1978, Appellant's former business partner stated he would "get" Appellant. This is a frivolous argument and is totally unrelated to Appellant's guilt or innocence in this case. Under these circumstances, counsel will not be deemed ineffective. *Commonwealth v. Metzger*, 295 Pa.Superior Ct. 267, 441 A.2d 1225 (1981).

■ Secondly, Appellant claims counsel was ineffective in failing to object to the lack of a point for charge relative to Appellant's prior misconduct. Appellant's trial counsel will be declared ineffective if, in light of all the alternatives available to counsel, the strategy actually employed was so unreasonable that no competent lawyer would have chosen it. *Commonwealth v. Miller*, 494 Pa. 229, 431 A.2d 233 (1981); *Commonwealth v. Hill*, 427 Pa. 614, 235 A.2d 347 (1967). Since the evidence concerning Appellant's prior misconduct toward his wife was held admissible, there could

be no ineffectiveness in not asking for a point for charge concerning that misconduct.

■ Appellant next argues trial counsel was ineffective in failing to call certain character witnesses during Appellant's trial. Counsel, in fact, presented seven (7) witnesses who testified concerning Appellant's good character. It is very conceivable counsel thought this a sufficient number of witnesses and that additional witnesses would only be cumulative. Since trial counsel has broad discretion in determining his trial strategy, *Commonwealth v. Mizell*, 493 Pa. 161, 425 A.2d 424 (1981), we will not assume that counsel's decision to call numerous witnesses to testify to Appellant's good reputation in the community, was anything but effective.

Appellant also claims ineffective assistance of counsel for failure to object to three statements at trial which Appellant claims are hearsay and not admissible. The statements include: 1) testimony by counsel for Appellant's wife regarding two conversations he had with his client; 2) testimony by Appellant's neighbor (Terry Kuhns) regarding conversations she had with Appellant's wife; and 3) testimony by Doctor Young regarding a conversation he had with his patient Caroline Albrecht, regarding her emotional and physical state of being. This evidence, as previously discussed, was admitted for purposes of showing Appellant's prior misconduct towards his wife, and was offered to explain a course of conduct. As such, it is admissible. *Commonwealth v. Cruz*, 489 Pa. 559, 414 A.2d 1032 (1980).

■ Appellant's next argument states that trial counsel was ineffective in failing to object, at the penalty stage, to the incorporation of the trial record. This argument is frivolous. Appellant's guilt had already been determined, and the incorporation of this evidence into the penalty stage was purely a procedural matter carried out pursuant to 42 Pa.C.S. § 9711.

■ Appellant's last ineffectiveness claim is also frivolous. Appellant claims trial counsel was ineffective in failing to call additional character witnesses at the penalty stage. 42 Pa.C.S. 9711(a)(2) states that evidence *may* be presented during the sentencing hearing. Counsel is not required to present character testimony and, coupled with the fact that he presented seven (7) character witnesses at trial before the same jury, leads us to the conclusion that there was no ineffectiveness.

■ Finally, in accordance with our statutory obligation[16] to review sentences of death from the standpoint of their proportionality to sentences in similar cases, *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 62, 454 A.2d 937, 961 (1982), cert. den., 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983), we have reviewed Appellant's death sentence in light of the Pennsylvania Death Penalty Study, compiled by the Administrative Office of Pennsylvania Courts (AOPC) pursuant to our directive. See *Commonwealth v. Frey*, 504 Pa. 428, 475 A.2d 700 (1984); *Commonwealth v. Travaglia*, 502 Pa. 474, 467 A.2d 288 (1983). We find that the sentence of death is not excessive or disproportionate to the penalty imposed in similar cases. 42 Pa.C.S. § 9711(h)(3)(iii).

Accordingly, we affirm the conviction of murder of the first degree, the convictions of murder of the second degree, the conviction of arson, and the sentence of death.[17]

16. Section 9711(h)(3) states:
(3) The Supreme Court shall affirm the sentence of death unless it determines that:
(i) the sentence of death was the product of passion, prejudice or any other arbitrary factor;
(ii) the evidence fails to support the finding of an aggravating circumstance specified in subsection (d); or
(iii) the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant.

17. The Prothonotary of the Eastern District is directed to transmit the full and complete record of the trial, sentencing hearing, imposition of sentence, and review by this Court to the Governor. 42 Pa.C.S. § 9711(i).