J-S58012-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| RUSSELL WEATHERS, | |
| Appellant | No. 940 MDA 2015 |

Appeal from the Judgment of Sentence March 20, 2015
in the Court of Common Pleas of Dauphin County
Criminal Division at No.: CP-22-CR-0005545-2013

BEFORE: GANTMAN, P.J., BOWES, J., and PLATT, J.[*]

MEMORANDUM BY PLATT, J.: **FILED AUGUST 22, 2016**

Appellant, Russell Weathers, appeals from the judgment of sentence entered in the Dauphin County Court of Common Pleas following his jury conviction of two counts of aggravated assault,[1] and one count of simple assault.[2] He challenges the sufficiency of the evidence for aggravated assault and the admission of evidence of other assaults. We affirm on the basis of the trial court opinion.

In its opinion, the trial court fully and correctly sets forth the relevant facts and procedural history of this case. Therefore, we have no reason to

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S.A. § 2702(a)(1).

[2] 18 Pa.C.S.A. § 2701(a)(1).

restate them at length here. For the convenience of the reader we note briefly that Appellant's convictions arose out of a physical attack on his then live-in girlfriend, in which he banged her head against a taxicab and threw her headlong on to the sidewalk. Her nose was fractured in three places. A passerby saw the assault and called 911. Nevertheless, the victim, still financially dependent on Appellant, was indecisive about whether to continue or end the relationship. For a while, the victim denied Appellant was her assailant. She blamed an unknown stranger. In the end she identified Appellant.

At trial, the court permitted the Commonwealth to introduce evidence of a prior 911 call announcing the caller intended to kill the victim. The call was placed from the telephone in the home the victim shared with Appellant, and the victim identified his voice as that of the caller. The jury convicted Appellant of all charges.

Appellant raises the following two questions for our review:

1. Whether the evidence presented at trial of this matter was legally insufficient to show the victim suffered a **serious bodily injury**, as contemplated by the Aggravated Assault statute[?]

2. Whether the Honorable Trial Court erred by permitting the Commonwealth to introduce evidence pursuant to Pa.R.Evid. 404(b) of other assaults purportedly made by [Appellant] on the same victim at trial of this matter[?]

(Appellant's Brief, at 8) (emphasis in original).

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the trial court, we conclude that there is no merit to the issues Appellant has raised on appeal. The trial court opinion properly disposes of the questions presented. (*See* Trial Court Opinion, 11/23/15, at 17-24) (concluding that: (1) viewing evidence in light most favorable to Commonwealth as verdict winner, there was more than sufficient evidence for jury to infer that Appellant intended to inflict serious bodily injury and that victim suffered serious bodily injury; and (2) trial court properly exercised its discretion in admitting evidence of Appellant's prior assaults against victim to establish intent, motive, and to show complete chain of events leading up to crime.). Accordingly, we affirm on the basis of the trial court's opinion.

Judgment of sentence affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/22/2016

- 3 -

Circulated 08/06/2016 01:51 PM

ORIGINAL

COMMONWEALTH OF PENNSYLVANIA   :  IN THE COURT OF COMMON PLEAS
                               :  DAUPHIN COUNTY, PENNSYLVANIA
                               :
                   v.          :  DOCKET NO.: 5545 CR 2013
                               :
RUSSELL WEATHERS               :  (940 MDA 2015)

## MEMORANDUM OPINION

Appellant, Russell Weathers ("Appellant" or "Weathers") is appealing this Court's judgment of sentence entered March 20, 2015. This opinion is written pursuant to Pa.R.A.P. 1925(a).

## PROCEDURAL HISTORY

Appellant, Russell Weathers was charged with two counts of Aggravated Assault – Intent to Cause Serious Bodily Injury ("SBI")[1] and Attempt to Cause SBI,[2] and one count of Simple Assault.[3] The Commonwealth proceeded on alternate theories at trial alleging that Appellant actually did cause serious bodily injury to the victim and/or that Appellant attempted to cause serious bodily injury to the victim. (Notes of Testimony at 4).[4] A jury trial was held on February 9-11, 2015, at the conclusion of which he was found guilty of all charges.

As a result of his convictions, on March 20, 2015, Mr. Weathers was sentenced at Count One to a period of incarceration of not less than 108 months nor more than 240 months, a fine of $2500, and the payment of the costs of prosecution. Counts Two and Three merged for purposes of sentencing and it was ordered that Weathers is

---

[1] 18 Pa.C.S. § 2702(a)(1).
[2] 18 Pa.C.S. § 2702(a)(1).
[3] 18 Pa.C.S. § 2701(a)(1).
[4] Hereinafter "N.T."

prohibited from any contact in any manner with the victim.  Appropriate time credit was applied.

At the conclusion of trial, Mr. Weather's attorney, Jason Duncan, Esquire, was relieved of his duties as counsel in accordance with Weathers' request.  No post-sentence motion was filed in this matter.  A *pro se* Notice of Appeal to the Pennsylvania Superior Court was filed on April 1, 2015.  After the appeal was filed, Mr. Weathers filed *pro se* correspondence on May 14, 2015, stating that he wished to keep Attorney Duncan as his counsel to file an appeal.  By way of letter, this Court informed Appellant that, as he had already filed a Notice of Appeal, we were without jurisdiction to entertain his request and that he would have to apply to the Superior Court for any request for relief.

Mr. Weathers filed an Application for Appointment of Counsel with the Superior Court on June 24, 2015.  Accordingly, the Superior Court directed this Court to conduct a hearing pursuant to *Commonwealth v. Grazier*, 713 A.2d 81 (Pa. 1988) to determine whether Defendant wished to proceed with Jason B. Duncan, Esquire, *pro se*, or to apply for appointment of counsel.  The hearing was held on July 20, 2015, during which Mr. Weathers expressed his wish for new appointed counsel.  By order date July 22, 2015, this Court appointed Michael O. Palermo, Esquire to represent Appellant for purposes of his direct appeal.

On August 31, 2015, Appellant applied to Superior Court for remand of the record for the purpose of filing a Concise Statement of Matters Complained of on Appeal pursuant to Pa.R.A.P. 1925(b).  Appellant's application was granted and by

2

order dated October 1, 2015, the record was remanded to the trial court for the filing of a 1925(b) statement within twenty-one (21) days of the date of the Order. In accordance with the October 1, 2015 order, Superior Court retained jurisdiction and directed the trial court to file a supplemental 1925(a) opinion within thirty (30) days of Appellant's filing of his 1925(b) statement. The 1925(b) statement was filed on October 22, 2015.

On appeal Appellant raises the following issues for review:

> 1. The Honorable Trial Court erred by permitting the Commonwealth to introduce evidence pursuant to Pa.R.Evid. 404(b) of other assaults purportedly made by the Defendant on the same victim at trial of this matter.
>
> 2. The evidence presented at trial of this matter was legally insufficient to show the victim suffered a *serious bodily injury*, as contemplated by the Aggravated Assault statute. (Emphasis in original).

The following opinion is this Court's supplemental trial court opinion submitted in compliance with the Superior Court's August 31, 2015 order.

## FACTUAL BACKGROUND

This case stems from an August 1, 2013 physical assault on Abigail Shaw ("Ms. Shaw") in front of her apartment building located at 314 S. 2nd Street, Harrisburg Pennsylvania. Ms. Shaw and Mr. Weathers had become involved in a romantic relationship beginning in August 2012. (N.T.at 22-23). As the relationship progressed, around November 2012, the two moved in together at the South 2nd Street apartment along with Ms. Shaw's three children. (N.T. at 24-25).

3

Ms. Shaw testified at trial to her version of the relationship with Mr. Weathers and the events of August 1, 2013. Ms. Shaw described her relationship with Mr. Weathers as initially good until the end of November 2012, when she encountered her first bout of violence with him. (N.T. at 25-26). She stated that during the first incident, Weathers grabbed her by the neck and threw her around. (N.T. at 26). Despite Ms. Shaw's view that the relationship was good as they "didn't really have too many arguments," Weathers was violent again in December 2012. (N.T. at 26-27). Again, he picked up Shaw by her neck, smacked her head against a window and off the floor. (N.T. at 27). In addition to harming Shaw, after the December incident he smashed the television with a hammer because she tried to laugh off the assault and ignore him in an attempt to signal that she was not scared of him. (N.T. at 27-28). Because of his anger about Shaw's behavior, he also got a knife, grabbed her by the neck again and called his cousin to say he was going to kill her. (N.T. at 28). While blocking the knife with her arm, she was cut. (N.T. at 28-29). She explained that most of the violent encounters stemmed from his inability to cope with the death of his mother and money issues connected with his mother's estate and family. (N.T. at 26-27; 31-32).

The violent and controlling behavior by Weathers escalated during 2013. Ms. Shaw testified that Appellant monitored her cellphone, restricted her from seeing friends, did not permit her to have a car and would appear at her workplace and school to check on her whereabouts. (N.T. at 29-32). The constant presence at her workplace caused her to quit her job. (N.T. at 31). Additionally, co-workers at a bar where she had been employed noticed fingerprint bruises on her neck and arms and lumps on her head. (N.T. at 111). Weathers was not permitted in the bar when she was working. (Id.)

4

According to Ms. Shaw, the assaults became daily occurrences beginning in April 2013. (N.T. at 32). On one occasion, when Weathers asked if she wanted to leave and she answered yes, he proceeded to throw her down the steps. (N.T. at 30). Another beating occurred when Shaw permitted her youngest son's father to visit while she and Weathers were not home. (N.T. at 33-34). On another occasion, Ms. Shaw attempted to leave and even had her children packed in the car, but Weathers arrived home before she left. She stated that she went back inside the apartment so he would not cause a scene. Despite her return to the apartment, he hit her and told her she wasn't allowed to leave. (N.T. at 34-35). When asked why she had not called the police on any of these occasions, Shaw responded that she no longer had her circle of friends and her relationship with her mother was not close thus, she had no support system or any place to go. (N.T. at 34).

On December 8, 2012, at approximately 3:46 a.m. a call was made to 911 by a male who said he was going to kill Ms. Shaw. (N.T. 37). A police officer was dispatched to the South 2nd Street location to investigate the call. (N.T. at 36-37). Ms. Shaw informed the officer that she did not know about the call and let him look through the house to verify everyone was safe. (N.T. at 36-37). When the recording of the 911 call was played for the jury, Shaw identified the voice as Appellant's and based on the phone number, verified that it had been placed from the house phone. (N.T. at 37-38; 114). When she confronted Weathers about the call she was hit by him. (N.T. at 39). On two more occasions, a similar call was made to 911 prompting additional police visits to the home. (N.T. at 39-40).

5

The incident that gave rise to the charges in this matter occurred in the early morning hours of August 1, 2013. (N.T. at 40). Ms. Shaw had returned from her classes for the day where she found Mr. Weathers listening to music on his iPad. She stated that around 7:00 p.m. he had gotten emotional while listening to music that he used to enjoy with his deceased mother so, he stormed out of the house saying he was going to buy cigarettes. (N.T. at 40-41).

Later, around 9:00 p.m., Ms. Shaw took her children to the grocery store but when she returned, she realized that she had locked herself out of the apartment. (N.T. at 41). She placed a note on the front door stating the she was locked out and attempted to find a place to stay in the meantime. After being unsuccessful at finding a friend who was home, Shaw returned to the apartment to wait in the car for Weathers to return. (N.T. at 41-44). She later awoke to a cab pulling in behind her parked car with Mr. Weathers in the front passenger seat. Shaw explained that she knew it was Weathers because they used cabs regularly and, since he and the cab driver were friends, he would ride in the passenger seat. (N.T. at 45). Ms. Shaw approached the passenger door saying she had been locked out when Weathers' arm came out of the open window and, as he said "bitch, you're playing me," he smacked her head off the front hood of the vehicle. (N.T. at 45-47). Weathers then got out of the car, grabbed Shaw by the neck and slammed her to the ground while her 8 year old son was watching. (N.T. at 47). As she was on her back, he smacked her head against the street and punched her in the face while repeatedly calling her a bitch. (N.T. at 48). Ms. Shaw remembers Appellant leaving in the cab and then driving to Harrisburg Hospital. (N.T at 48).

6

On that same night, Mark Cicak ("Mr. Cicak") was returning home from his employment from UPS in Harrisburg. (N.T. at 177-178). He had worked the night shift which usually ended between 2:00 a.m. and 4:00 a.m. (N.T. at 178-179). While driving in the far left lane on South 2nd Street around 3:00 a.m., Mr. Cicak saw a couple on the sidewalk to his left against a parked car, who he thought were in an intimate embrace until the man threw the woman to the ground and began assaulting her. (N.T. at 178-179). Mr. Cicak immediately called 911. He then circled the nearby blocks so he could drive past on Second Street again. (N.T. at 180-181). He reported that the male was wearing a white T-shirt, jeans and a black hat. (N.T. at 190).

When Mr. Cicak arrived back on Second Street, he saw the same pair but now the assault was occurring in the street with the male punching and kicking the female. (N.T. at 180-181). At all times, Cicak was on the telephone with 911 describing the events he was witnessing. (N.T. at 181). He passed them and looped around a third time when he saw the assault stop and the male jump into the passenger side of a cab and leave. (N.T. at 181). Mr. Cicak tried to follow the cab straight on Second Street to obtain a license plate number; however, he was unsuccessful. (N.T. at 181-182). He then circled back a third time to ascertain the condition of the female but, when he arrived at the area where the assault took place, she was gone. (N.T. at 182). After one more loop to see if she was walking along Second Street, he encountered the police at the scene of the assault. (N.T. at 182). Mr. Cicak stopped to speak with the police to relay what he had witnessed. (Id.)

Approximately two to three months later, Detective William Jackson ("Det. Jackson"), a Detective with the Dauphin County District Attorney's Office, contacted Mr.

7

Cicak to discuss the events he had observed in the early morning of August 1, 2013. (N.T. at 184). During the meeting with Det. Jackson, Mr. Cicak identified Mr. Weathers in a photo array as the man he saw assaulting the woman on Second Street. (N.T. at 184; 197). Mr. Cicak identified Weathers again as the perpetrator during the preliminary hearing. (N.T. at 186-187).

Upon arrival at the hospital, Shaw remembers parking and falling out of the car as she tried to exit. (N.T. at 48-49). Her nose was broken in three places, she had cuts and bruises and a concussion. (N.T. at 49-54). In the emergency room, her injuries were treated, she was cleaned up and provided a change of clothes. (Id.)

Abigail Glenzel ("Nurse Glenzel") was the nurse who treated Ms. Shaw on the night of August 1, 2013, when she was admitted to the emergency room for treatment. (N.T. 203-204). Nurse Glenzel cleaned her, administered medication and monitored her vital signs from the time she arrived until discharge. (N.T. at 204-205). Nurse Glenzel described Ms. Shaw as very tearful and upset by the events of the night. (N.T. at 206). Shaw reported to Nurse Glenzel that she had been locked out of her house and when her boyfriend returned he assaulted her. (N.T at 206). Hospital personnel had called the police and the YWCA. (N.T. at 206).

Detective Christopher Silvio ("Det. Silvio") had been dispatched to the area of Second and Paxton Streets near a fire house to investigate a report of a male beating a female but, when he arrived no one was in the area. (N.T. at 208-209). Det. Silvio spoke to Mr. Cicak about what he had seen earlier. (N.T. at 209). Shortly thereafter,

8

Officer Pyles notified him that a female assault victim had come into Harrisburg Hospital so, he proceeded there. (Id.)

Det. Silvio spoke to Ms. Shaw in the emergency room where he found her to be very upset, crying and initially difficult to speak with. (N.T at 210). He testified that she was bleeding from her face, he nose was swollen and her eyes were bruising. (N.T. at 210). Once she calmed down enough for him to communicate with her, Det. Silvio asked who assaulted her; she reluctantly replied that her boyfriend, Russell Weathers had beaten her. (N.T. at 210-211). Ms. Shaw explained to Silvio that she had been locked out of her house when Weathers arrived in a taxi and needed to be let in. (N.T. at 211). She went on to describe how his arm came out of the car window, grabbed her neck and bounced her head off the cab then, after he exited the cab, he slammed her head on the sidewalk and road. (Id.)

While interviewing Ms. Shaw, Det. Silvio noticed bruising on her arms and when questioned about it, she volunteered that they were from prior assaults by Mr. Weathers. (N.T. at 213). As it is the policy of the Harrisburg Police Department to obtain a written statement from domestic violence victims, he requested Shaw to complete form; however, she refused and indicated such on the police form. (N.T. at 211-212).

Det. Silvio was also involved in the investigation of the December 8, 2012 call to 911. (N.T. at 213). The police traced the phone number from the call to Ms. Shaw's residence which led them to the South Second Street apartment. (N.T. at 213-214). The 911 call was from a male reporting that he was killing a female at that address.

9

(N.T. at 214). Upon arrival, Det. Silvio encountered a cab parked outside and while questioning the driver, Weathers exited the residence. (N.T. at 214). When detained and questioned by the police about the call, he denied knowing anything about it. Det. Silvio proceeded inside, spoke with Ms. Shaw, checked on the safety of the residents and, since there were no signs of a violent incident, released everyone from the scene. (N.T. at 215). At trial, Det. Silvio identified Mr. Weathers as the male he had detained and questioned on that night. (N.T. at 215).

When Ms. Shaw was discharged from the hospital she took her kids to Lebanon, Pennsylvania to stay with a family friend that considered a mother figure. (N.T. at 55). She then went to her real mother's place of work to have her return to the apartment with her. (N.T. at 54-55). As the hospital had arranged for a locksmith to meet at the Second Street residence to enable Shaw to enter and retrieve her belongings, she had to be there by 9:00 a.m. (N.T. at 55-56).

When Shaw arrived with her mother, the locksmith was already there. The locksmith began to work on the lock for the outside door which allowed entry to a hallway and interior apartment doors. (N.T. at 56-57). While the locksmith was working, Mr. Weathers opened the door. (N.T. at 56-58). Ms. Shaw was behind the locksmith who moved to block Weathers' access to her while she passed by to run up the stairs to the apartment. (N.T. at 57-58). Shaw said that, when she was entering the residence, Mr. Weathers was "running his mouth" at her and then went into the 1st floor apartment. (N.T. at 58-59).

10

According to Ms. Shaw, once she retrieved her belongings, she left with her mother to travel back to Lebanon after stopping at her school for her books and other items. (N.T. at 61). She recalled ending up at her "other mom's house" in Lebanon and staying for the next two days. (N.T. at 61).

When Ms. Shaw entered the apartment she observed destruction throughout the entire house. (N.T. 63-64). Examples of what she had encountered are: overturned furniture, broken furniture, torn clothing, broken glass from mirrors and picture frames, torn photographs, and a toilet ripped from the floor spouting water. (N.T. at 64-78). Ms. Shaw noted that none of Mr. Weathers' belongings had been destroyed. (N.T. 73).

Ms. Shaw testified that she does not remember calling 911 when she and the locksmith encountered Weathers at the apartment or speaking to police when they arrived. (N.T. at 59-60). However, she identified her voice on a recording of the 911 call. (N.T. at 60; Com. Exh. 14).

Ronald Ahmay ("Mr. Ahmay") is the locksmith who assisted Ms. Shaw testified at trial. When Ms. Shaw arrived, Mr. Ahmay commented on the condition of her face due to her injuries to which she replied that "[m]y boyfriend put me in the hospital…he broke my nose and gave me a concussion." (N.T. at 220). Mr. Ahmay became concerned for their safety so he asked Shaw where her boyfriend was and she stated that he was in jail. (N.T. at 220).

Mr. Ahmay proceeded to pick the lock when Weathers suddenly opened the door. (N.T. at 220-221). At that point in time, Weathers ran into a door on the left for the 1st floor apartment and Shaw ran past Ahmay to go up the stairs. (N.T. at 221). While

11

Mr. Ahmay stood in the foyer to ensure Ms. Shaw's safety, Weathers kept screaming "I did this for you." (N.T. at 221). Ms. Shaw came down the steps and Mr. Weathers ran around the side of the house. (N.T. at 222). Mr. Ahmay testified that the police apprehended him in the alley behind the house. (N.T. at 222). In court, he identified Weathers as the defendant. (N.T. at 221).

On August 1, 2013, Corporal Robert Minnier ("Cpl. Minnier") was dispatched to the South Second Street location in response to a call for a wanted male and property damage. (N.T. at 225). As he drove to the location, he received a radio call that Officer Sanderson had spotted the suspect nearby in the area of River and Mary Streets so, he proceeded there to assist in the apprehension. (N.T. at 225-226). Once Weathers was in custody he, along with Officer Bielenda, met with Ms. Shaw to obtain further information and photograph the property damage. (N.T. at 227-228). Cpl. Minnier identified Weathers as the defendant at trial. (N.T. at 227).

Despite the August 1, 2012 incident, Ms. Shaw continued to remain in contact with Mr. Weathers. (N.T. at 79-80). She even contacted him by telephone the next day, August 2, 2012. (N.T. at 80-82; Com. Exh. 74-75). She confronted him for smacking her head off the ground and at that point he did not deny it or ask who had hurt her. (N.T. at 262-264; Com. Exh. 74). Ms. Shaw stated that when she contacted Mr. Weathers, she tried to have him see the situation from her point of view in that he was supposed to love her and yet, he was hurting her and he destroyed their home. (N.T. at 84;164). Ms. Shaw wanted to get the "good times" and what she considered to be her family back again. (N.T. at 85-87).

12

In the aftermath of the incident, while she was emotionally processing the progression of her relationship with Mr. Weathers and her "mixed feelings of love and hurt", Ms. Shaw continued to stay in contact by telephone, email and in person. (N.T. at 87-99; 136-140; 170-176). Ms. Shaw refused to provide a statement to Det. Jackson implicating Mr. Weathers and also refused to appear for the preliminary hearing while laboring under the misconception that the case would just disappear. (N.T. at 84-90; 126-127). When she later appeared for a rescheduled preliminary hearing, she expressed a reluctance to testify and stated that some other unknown black male had assaulted her. (N.T. at 89; 131-132). Another factor contributing to Ms. Shaw's unwillingness to identify Mr. Weathers as the perpetrator was his use of money to keep control of her circumstances. (N.T. at 92-94). Mr. Weathers acknowledged that there was a point in the relationship when she stopped working to finish school and, therefore, she was reliant upon him for financial support. (N.T. at 255-256). Once the matter was set for trial, Ms. Shaw was arrested on two material witness warrants for failure to appear on behalf of the Commonwealth. (N.T. at 90-95).

A few months later, events in Ms. Shaw's life changed her perspective on Weathers' treatment of her. (N.T. at 99). In December 2013, she experienced the loss of a friend as a result of a domestic violence incident. (N.T. at 97). Ms. Shaw testified that she cut off contact with Weathers between January 2014 and May 2014 because "[she] felt like [she] was just here for convenience and [she] felt like it was going to come back and hit [her] ten times harder." (N.T. at 97). She eventually contacted a social worker for help. (N.T. at 97-98).

13

During this time, Appellant continued to try and contact her on his own and through third parties in an attempt to persuade her that things had changed. (N.T. at 99). In May of 2014, she began to believe that the relationship would change. (N.T. at 169). However, shortly thereafter, Ms. Shaw became so alarmed by his increasing aggression and repetitive attempts to contact her that she contacted one of her son's fathers to ensure that he would take custody of the boy if something would happen "[b]ecause I [felt] like Russell would hurt me, whether it is now or ten years from now." (N.T. at 100-101).

Ms. Shaw decided on her own to go to the District Attorney's Office. (N.T. at 101). Although she was in contact with Weathers a few times after coming to the District Attorney's Office to cooperate, Ms. Shaw said when he called she would tell him what he wanted to hear because the repetitive calls were every day were making her tired. (N.T. at 161-162). Prior to trial, she finally changed her telephone number. (N.T. at 163).

Appellant testified on his own behalf to present his version of events. At the time of the August 1, 2012 incident, Mr. Weathers was working for a painting contractor. (N.T. at 233-235). He testified that on the night beginning July 31, 2012 and leading into the morning of August 1, 2012, he was working with an individual named Mike to finish painting apartment units and hallways at the Camp Hill Plaza Apartments. (N.T. at 235-236). Weathers said that they were up against a deadline so the two decided to stay late and finish the painting. (N.T. at 236).

14

Mr. Weathers had seen Ms. Shaw earlier in the day when she came to the job site asking to trade in the rental car they had been driving for a different one. (N.T. at 238). He left work for a time to travel with Shaw to change rental vehicles. (N.T. at 249). Mr. Weathers stated that after the cars were traded he called his co-worker Tony to pick him up and bring him back to the work site. (N.T. at 240). From work he went back to Mike's apartment in downtown Harrisburg for a break then returned to the job site to finish painting until approximately 2:00 a.m. Weathers then spent the night at Mike's place. (N.T. at 236; 249).

According to Mr. Weathers, he returned to the South Second Street residence the next morning to find the house "tore up" and thought Ms. Shaw had made the mess. (N.T. at 240-241; 274). While waiting, he heard a noise from the front door. When he went to the door, he saw Mr. Ahmay picking the door lock. (N.T. at 241). Weathers also saw Ms. Shaw's face and asked her what had happened. (N.T. at 241; 275). Ms. Shaw walked past him and up the stairs as he went into the 1st floor bathroom to purportedly turn off the water to stop the leaking. (N.T. at 241; 272-273). When Mr. Weathers returned to the front door, he saw Ms. Shaw get in a car with her mother and realized something was not right between them. (N.T. at 241-242). He began to walk away from the house when he was apprehended by the police, arrested and taken to Dauphin County Prison ("DCP"). (N.T. at 242).

Once in DCP, Appellant called Ms. Shaw to find out why he was arrested. (N.T. at 242-243). Weathers said that Ms. Shaw told him that she did not know what was going on and she was being forced to give a story. (N.T. at 242). According to Weathers, when he questioned Shaw about who beat her up and ransacked the house

15

at a DCP visiting day, she would not answer him. (N.T. at 243-244). Weathers described Shaw as forceful and argumentative. (N.T. at 247). He believed that she had been the one to destroy the house as a result of her anger about past relationships. (N.T. at 246-247).

During the time he was in communication with Ms. Shaw while incarcerated, Weathers believed that they were trying to figure out who had committed the crime and put their relationship back together. (N.T. at 248-249). Appellant was shocked when he found out from Det. Jackson that Shaw had identified him as the person who assaulted her and ransacked the house. (N.T. at 249).

Weathers denied ever assaulting Ms. Shaw at any time. (N.T. at 237; 244). During a phone conversation while he was incarcerated he apologized for messing things up for her but, he said it had nothing to do with putting his hands on her. (N.T. at 258). Weathers said that the pair occasionally argued but the situation never escalated to a point when it became physical because he would walk away from the confrontation. (N.T. at 237). Although, he did acknowledge that there were some times when the arguments would get physical and he'd push Shaw off him if she jumped on him. (N.T. at 257).

The Commonwealth presented Det. Jackson as a rebuttal witness. Det. Jackson had contact with Mr. Weathers when, after the charges were refiled and Weathers was present at central booking, he requested to speak with Jackson. (N.T. at 291-292). After advising Weathers of his *Miranda*[5] rights, Det. Jackson spoke with him. (N.T. at

---

[5] *Miranda v. Arizona*, 384 U.S. 436 (1966).

16

292). Appellant stated that on August 1, 2012, he had returned to the South Second Street residence late at night and discovered that it had been broken into, ransacked and that water was leaking everywhere. (N.T. at 293). Weathers did not say to Det. Jackson that he thought Ms. Shaw had done it. Appellant stated that Ms. Shaw had not returned to the home until the morning. (N.T. at 293).

## DISCUSSION

Appellant's first claim of error is that this Court erred in admitting evidence of prior purported assaults on the victim in violation of Pa.R.E. 404(b). "Admission of evidence is within the sound discretion of the trial court and will be reversed only upon a showing that the trial court clearly abused its discretion. An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record." *Commonwealth v. Tyson*, 119 A.3d 353, 357-58 (Pa. Super. 2015)(internal citations and quotation marks omitted). Pursuant to the Pennsylvania Rules of Evidence:

> *(1) Prohibited Uses.* Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.
>
> *(2) Permitted Uses.* This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. In a criminal case this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice.
>
> *(3) Notice in a Criminal Case.* In a criminal case the prosecutor must provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence the prosecutor intends to introduce at trial. (Pa.R.E. 404(b)).

17

Appellant's 1925(b) statement is somewhat general as to what specific evidence of prior assaults that was admitted at trial he is now challenging. Therefore, to properly address the issue, this Court will look to the pre-trial briefs submitted by the parties for guidance.

Prior to trial in this matter, the Commonwealth gave Appellant notice of its intention to present evidence at trial of prior bad acts of the defendant for reasons other than to prove a general criminal propensity. More specifically, the Commonwealth was seeking the admissibility of Ms. Shaw's testimony regarding the nature of the physically and emotionally abusive relationship with Mr. Weathers as well as a December 8, 2012 call to 911 wherein he purportedly reported that he was going to kill the female in his residence. With this evidence, the Commonwealth sought to show the defendant's motive, intent and malice towards the victim and to explain why Ms. Shaw failed to identify Mr. Weathers as her assailant for an extended length of time.

Defense counsel challenged the admissibility of the evidence as violative of Pa.R.E. 404(b) contending that the purpose for which it was being presented was to impermissibly prove Mr. Weathers committed this crime because he has had a violent past. The defendant also argued that to allow the proffered evidence to explain why Ms. Shaw refused to identify Appellant as the perpetrator, namely that she was afraid of him due to his violent behavior, is also improper as it is more prejudicial than probative. He posited that the fact that Weathers was incarcerated for approximately a year before the trial and unable to injure her, vitiates her contention that she was afraid to identify him; therefore, the only effect of the testimony would be to give the jury the impression that defendant is just a bad person.

18

This Court had counsel brief the issues and heard argument immediately prior to jury selection. The Commonwealth's motion was granted and Defense counsel's objection was preserved for the record. (N.T. at 5).

Upon review of the parties' positions and the applicable law, this Court finds that the proffered evidence was properly admissible for multiple reasons set forth in Pa.R.E. 404(b). More particularly, this Court finds that the Ms. Shaw's testimony regarding the progression of her relationship with Mr. Weathers and her reluctance to identify him as the perpetrator of the assault on her was relevant to prove motive, identity and an intent to harm her as well as complete the story of this case and present the natural development of the course of events. For the same reasons, Ms. Shaw's and Det. Silvio's testimony in connection to the December 8, 2012 call to 911 as well as the recording of the call played for the jury was also properly admitted under Rule 404(b).

To prove its case, the Commonwealth was required to establish that Weathers had the intent to inflict serious bodily harm on Ms. Shaw. The relevant purpose of Ms. Shaw's testimony regarding the nature of her relationship was to establish an ongoing intent on Appellant's behalf to inflict injury upon her if she did not do his bidding or remain under his control at all times. The testimony painted a picture of an ever increasing degree of jealousy and fear on the part of Weathers that Shaw was seeing another man or would leave him. To combat his irrational thoughts, he placed increasingly more restrictive controls on Ms. Shaw such as, isolating her from friends and family, dictating where she was allowed to go when she left the house, if she was allowed to leave at all and checking up on her at school and work. Eventually, the physical violence began and escalated in frequency in a relatively short period of time

19

given the fact that the parties had only lived in the same household for nine months before the final assaultive incident occurred.

Ms. Shaw testified that the first incident of physical violence took place during November 2012, the month when the pair moved in together. (N.T. at 25-26). During that incident he dragged Shaw around by the neck and picked her up to throw her on the ground. (Id.) From that point on, the physical attacks became more violent and frightening until culminating in the August 1, 2013 assault. Acts of violence described by Shaw included being grabbed by the neck, having her head smacked into a window or wall, having a TV smashed by a hammer because she was ignoring him and having her arm cut from fending off a knife attack. Her testimony was supported by the December 8, 2012 call to 911 for which Shaw identified Weathers as the caller and that the call was made from the house number. During that call he did not just threaten harm rather, he said was going to kill the female in the house.

As aptly pointed out by the Commonwealth, our Supreme Court has recognized that this type of evidence, whether the incidents were reported and/or resulted in a conviction, is routinely admitted as relevant to demonstrate continual and escalating abuse by the defendant of the victim and establish "that the distinct crime or bad act 'was part of a chain or sequence of events which formed the history of the case and was part of its natural development.' " *Commonwealth v. Drumheller*, 570 Pa. 117, 137, 808 A.2d 893, 905 (2002) *citing Commonwealth v. Walker,* 540 Pa. 80, 656 A.2d 90 (1995), *cert. denied,* 516 U.S. 854, 116 S.Ct. 156, 133 L.Ed.2d 100 (1995). The evidence was properly admitted to complete the story and establish Appellant's motive and intent to continually harm Ms. Shaw.

20

With respect to Appellant's position that the evidence should be inadmissible as it is more prejudicial than probative, this Court finds that the argument is without merit for several reasons. As for proving motive, the evidence of Weathers' controlling behavior due to jealousy and unfounded accusations of cheating on the part of Ms. Shaw corroborates her identification of Weathers as the perpetrator of the assault. Ms. Shaw testified that on the night of the incident she immediately walked up to Appellant and told him she was locked of the house but, his reaction was to grab her by the neck and smack her head into the front of the cab while yelling "bitch, you're playing me."

Additionally, the long term gradual increase in the intensity of the violence, control and isolation is probative as to Weathers' intent on the night of August 1, 2012, when he returned home to find that Shaw was not in the house as she was supposed to be in his mind. This is yet another example of Weathers thinking that she was out of the house doing something he thought she should not be doing and responding with violence. Finally, the Commonwealth did not produce evidence of a single, isolated incident; rather, the Commonwealth produced "a chain of evidence illustrating Appellant's continual abuse...". *Drumheller*, 808 A.2d 893, 904 *quoting* *Commonwealth v. Albrecht*, 510 Pa. 603, 511 A.2d 764, 772 (1986) *cert. denied* 480 U.S. 951, 107 S.Ct. 1617, 94 L.Ed.2d 801 (1987). The Appellant's behavior over the course of the relationship showed the development of his malicious intent towards Ms. Shaw which establishes a motive for the vicious assault. *Commonwealth v. Melendez-Rodriguez*, 856 A.2d 1278 (Pa. Super. 2004); *Commonwealth v. Funk*, 29 A.3d 28 (Pa. Super. 2011). [6] In conclusion, this Court finds that appropriate discretion was

---

[6] This Court also notes that pre-trial, defense counsel was contemplating a request for a jury instruction regarding the limited purpose for which the evidence of prior assault may be considered; however,

21

exercised in the admission of evidence of prior assaults by Weathers directed at Shaw for the purpose of establishing intent, motive and to show the complete chain of events in their relationship leading up to the crime.

Appellant's second claim of error is a challenge to the sufficiency of the evidence with respect to the "serious bodily injury" element of the aggravated assault statute. It is well established that:

> As a successful sufficiency of the evidence claim precludes a re-trial and results in discharge as to the crime in question, we address Appellant's sufficiency challenges at the outset. *Commonwealth v. Brown*, 52 A.3d 320, 324 (Pa.Super. 2012). In analyzing such claims, "we must determine whether the evidence admitted at trial, and all reasonable inferences drawn therefrom, when viewed in a light most favorable to the Commonwealth as verdict winner, support the conviction beyond a reasonable doubt." *Id.* at 323. Critically important, we must draw all reasonable inferences from the evidence in favor of the Commonwealth as the verdict winner. *Commonwealth v. Hopkins*, 67 A.3d 817, 820 (Pa.Super. 2013). "Where there is sufficient evidence to enable the trier of fact to find every element of the crime has been established beyond a reasonable doubt, the sufficiency of the evidence claim must fail." *Brown, supra* at 323. Of course, "the evidence established at trial need not preclude every possibility of innocence and the fact-finder is free to believe all, part, or none of the evidence presented." *Id.*
>
> The Commonwealth can meet its burden "by wholly circumstantial evidence and any doubt about the defendant's guilt is to be resolved by the fact finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances." *Id.* It is improper for this Court "to re-weigh the evidence and substitute our judgment for that of the fact-finder." *Id.* Additionally, "the entire record must be evaluated and all evidence actually received must be considered." *Id.*

*Commonwealth v. Kelly*, 78 A.3d 1136, 1139 (Pa. Super. 2013).

The pertinent sections of the aggravated assault statute with which Weathers was charged read as follows:

---

defense counsel opted against having the court instruct the jury on that particular issue. (N.T. at 325).

22

**(a) Offense defined.**--A person is guilty of aggravated assault if he:

(1) attempts to cause serious bodily injury to another, or causes such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life;

(2) attempts to cause or intentionally, knowingly or recklessly causes serious bodily injury to any of the officers, agents, employees or other persons enumerated in subsection (c) or to an employee of an agency, company or other entity engaged in public transportation, while in the performance of duty;

*******

(18 Pa.C.S. §2702(a)(1)-(2)).

Appellant specifically challenges the sufficiency of the evidence presented by the Commonwealth to prove serious bodily injury. The law on this issue is well-established. The appellate courts have defined "serious bodily injury" as, "[b]odily injury which creates a substantial risk of death or which causes serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." (18 Pa.C.S. § 2301). With respect to the Commonwealth's burden of proof:

> In order to sustain a conviction for aggravated assault, the Commonwealth does not have to prove that the serious bodily injury was actually inflicted but rather that the Appellant acted with the specific intent to cause such injury. *Commonwealth v. Lewis,* 911 A.2d 558, 564 (Pa.Super. 2006). Further,
>
> [w]here the victim does not sustain serious bodily injury, the Commonwealth must prove that the appellant acted with specific intent to cause serious bodily injury. The Commonwealth may prove intent to cause serious bodily injury by circumstantial evidence. In determining whether the Commonwealth proved the Appellant had the requisite specific intent, the fact-finder is free to conclude the accused intended the natural and probable consequences of his actions to result therefrom. A determination of whether an appellant acted with intent to cause serious bodily injury must be determined on a case-by-case basis.
>
> An intent is a subjective frame of mind, it is of necessity difficult of direct proof[.] We must look to all the evidence to establish intent, including, but not limited to, appellant's conduct as it appeared to his eyes [.] Intent can be proven by direct or circumstantial evidence; it may be inferred from

23

acts or conduct or from the attendant circumstances. Moreover, depending on the circumstances even a single punch may be sufficient."

*Commonwealth v. Holley*, 945 A.2d 241, 247 (Pa. Super. 2008) (internal citations and quotations omitted).

Upon review of the record, the evidence presented at trial viewed in light most favorable to the Commonwealth as the verdict winner is more than sufficient to establish that Ms. Shaw suffered serious bodily injury. Cast in the light of the past circumstances of Weathers' and Shaw's violent relationship, including prior assaults and calls to 911 with threats to kill the female in the house, the jury heard testimony about Ms. Shaw being thrown down and having her head pounded against the hood of an automobile and the sidewalk. The assault eventually spilled out into the street which put her at risk of being struck by an automobile in addition to suffering a beating. Mr. Ahmay witnessed the beating and also testified to witnessing Appellant punching and kicking Ms. Shaw. Ms. Shaw was treated at the hospital emergency room due to the assault as she had sustained a broken nose, facial lacerations and bruises as well as a concussion. The overwhelming evidence of record would easily permit the jury to infer that Appellant intended to inflict serious bodily injury to Ms. Shaw. Whether the injuries were actually life threatening, although a strong argument may be made that they were, is of no moment as "the conduct giving rise to the inference that the defendant intended to inflict serious bodily harm need not in itself be life threatening." *Commonwealth v. Catering*, 451 Pa. Super. 42, 46, 678 A.2d 389, 391 (1996) *citing Commonwealth v. Elrod*, 572 A.2d 1229, 1231. Accordingly, Appellant's conviction for aggravated assault must stand as this Court did not err in denying his Motion for a Directed Verdict of Acquittal.

24

In conclusion, this Court finds that Appellant's judgment of sentence should stand.

_____
RICHARD A. LEWIS, PRESIDENT JUDGE

MEMORANDUM DATE:  *Nov. 23, 2015*

**Distribution:**
Joseph Cardinale, Jr., Dauphin County District Attorney's Office
Michael Palermo, Esquire, Palermo Law Offices, 3300 Trindle Road, Camp Hill, PA 17011
Dauphin County Clerk of Courts
Superior Court Prothonotary
FILE – Pres. Judge Richard Lewis

25